**INLAND MEDIATION BOARD, et al., Plaintiffs,**

v.

**CITY OF POMONA, et al., Defendants. No. CV99–10102FMC(MCX).**

United States District Court, C.D. California.

Aug. 23, 2001.

John S. Ward, John S. Ward Law Offices, Los Angeles, CA, Christopher Brancart, Elizabeth N. Brancart, Pescadero, CA, for Inland Mediation Board, Inc.

John S. Ward, John S. Ward Law Offices, Los Angeles, CA, for Grace Cross.

David D. Lawrence, Michael P. Coyne, Pasadena, CA, for City of Pomona.

Michael Thomas, Paul R. Ayers, Michael Thomas Law Offices, Glendale, CA, for Wilfred Keagy.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

COOPER, District Judge.

This action, which arises under federal and state fair housing laws, involves the efforts of a landlord association's attempt to improve its neighborhood and the legal significance of the assistance offered by the City of Pomona to the association. Of special significance are the actions of the association's director, who is also a Defendant in this action, and the effect of those

actions upon a resident manager, Grace Cross, an African–American who attended an association meeting.

This matter is currently before the Court on two Motions for Summary Judgment filed by Defendant Keagy (docket # 67 and docket # 70, both filed on December 4, 2000), and a Motion for Summary Judgment filed by Defendant City of Pomona (docket # 68, filed December 4, 2000). For the reasons and in the manner set forth below, the Court **hereby grants in part and denies in part** these Motions. All parties have provided the Court with thorough and excellent briefs in connection with these motions. Therefore, the Court finds the matter suitable for resolution of all issues based on the arguments and authorities in the briefs. The July 30, 2001, hearing is removed from the Court's calendar.

## I. Plaintiffs' Claims

Plaintiffs Inland Mediation Board[1] ("IMB") and Grace Cross ("Cross") set forth a number of causes of action, but the substance of Plaintiffs' allegations is that Defendants Will Keagy ("Keagy") and the City of Pomona ("the City") engaged in unfair housing practices.

Plaintiffs' first cause of action, alleged against both Keagy and the City, is for violation of the federal Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq. Specifically, Plaintiffs allege violation of six separate provisions of the FHA: 1) Making unavailable dwellings because of a protected status, in violation of 42 U.S.C. § 3604(a); 2) Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of a protected status, in violation of § 3604(b); 3) Making statements, with respect to the rental of a dwelling, that indicate a preference, limitation, or discrimination based on a protect-

ed status, in violation of § 3604(c); 4) Misrepresenting the availability of a dwelling for rent because of a protected status, in violation of § 3604(d); 5) Interfering with the enjoyment of rights guaranteed by the FHA, in violation of § 3617; and 6) Failing to affirmatively further the purpose of the FHA in violation of § 3608.

The second cause of action is asserted by Cross against both Keagy and the City. This claim asserts a violation of 42 U.S.C. § 1982, which prohibits discrimination against African–Americans in the rental of housing.

Plaintiffs' third cause of action is asserted against both Keagy and the City. This claim asserts violations of California fair housing laws. Specifically, Plaintiffs assert the following claims in violation of California's Fair Employment and Housing Act ("FEHA"), Cal.Govt.Code § 12926, et seq.: 1) discrimination in the rental of housing because of a protected status, in violation of Cal.Govt.Code § 12955(a) and (d); 2) making, printing, or publishing any notice, statement, or advertisement that indicates a preference, limitation, or discrimination based on a protected status, in violation of Cal.Govt.Code § 12955(c); 3) aiding, abetting, inciting, compelling, or coercing the doing of any of the acts declared unlawful in FEHA, in violation of Cal.Govt.Code § 12955(g); and 4) otherwise making unavailable or denying a dwelling based on discrimination because of a protected status, in violation of Cal. Govt.Code § 12955(k).

The fourth cause of action is asserted by Cross against both Keagy and the City. This claim asserts a violation of California's Unruh Civil Rights Act, Cal.Civ.Code § 51, et seq. Specifically, Cross alleges that Defendants injured her by discriminating against her in the operation of the

---

**1.** IMB is a California nonprofit corporation that promotes equal opportunity in housing and elimination of all forms of illegal housing discrimination.

landlord association because of her protected status.

The fifth cause of action, which asserts violations of California's Unfair Business Practices law, was previously dismissed with prejudice. When Plaintiffs filed the Third Amended Complaint, they re-alleged this claim in order to properly preserve it for appeal.

The sixth cause of action is asserted by Cross as to Keagy only. Cross asserts a claim of intentional infliction of emotional distress against Keagy based on his actions and comments at an October 1, 1998, association meeting.

The seventh cause of action, which asserts a claim for negligence, was previously dismissed with prejudice. As with the fifth cause of action, when Plaintiffs filed the Third Amended Complaint, they re-alleged this claim in order to properly preserve it for appeal.

Finally, in the eighth cause of action Cross asserts a claim pursuant to 42 U.S.C. § 1983 against both Keagy and the City.

Both Defendants move for summary judgment as to all claims asserted against them.

## II. Uncontroverted Facts

### A. K–KAPS

Within the City there is a small area, bounded by Karesh, Kingsley, Abby, Pasadena, and St. Paul streets, that is known as the K–KAPS area. As measured by the 1990 United States Census, the minority population of the K–KAPS area is slightly higher than that of the City of Pomona as a whole.[2] The 1990 Census also shows that this area is comprised largely of rental units rather than owner-occupied housing.

For the last nine years Paula Lantz ("Lantz") has been the Pomona City Council member whose district includes this geographical area. In the early 1990's, a group of landlords who owned property in this area formed an association that eventually came to be known as K–KAPS. The initial efforts to form this group were taken by Kathryn Layton ("Layton"), who believed that the area had developed problems with drugs and crime. Keagy was a landlord who attended the early meetings of the association. K–KAPS was never incorporated, and it did not have written by-laws.

The goal of K–KAPS was to improve the neighborhood, and the association focused on tenant-screening as the primary vehicle for furthering that goal. In order to help landlords to better select desirable tenants, the association created a tenant screening committee that taught owners and managers how to screen rental applicants. The group also sought increased police presence, increased code enforcement, and increased property management and maintenance.

Lantz testified at her deposition that she did not assist in the founding of K–KAPS. (Lantz Depo. at 50). The uncontroverted evidence establishes, however, that Lantz offered significant assistance to this group throughout the course of its existence. For example, when Lantz became aware in 1992 or 1993 that some of her constituents

---

**2.** *See* Plaintiffs Exh. 21. The Court hereby overrules Defendant's objection to Exhibit 21 on the basis of Fed.R.Evid. 403. The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice.

Total minority population as a percentage of the total population of blocks 104, 105, and 106, in which the K–KAPS area is found, was 76.9%. The total minority population as a percentage of the total population of the City as a whole was 71.4%. The greatest disparity is found in the number of African–Americans. African–Americans comprised 24.7% of the population of blocks 104, 105, and 106, but comprised only 14.4% of the City as a whole.

had formed the association to address problems in the K–KAPS area, she made arrangements for the City to provide a police department representative to speak to the association. She also arranged for meeting space on City property, as well as free parking for those who attended the meetings.

In 1994, Lantz sent a number of letters on City Council letterhead to K–KAPS area apartment owners in an attempt to increase membership in the group and attendance at the group's meetings. (*See* Exh. 20).[3] In these letters, Lantz used phrases such as: "I would like to take this opportunity to cordially invite you to attend our next meeting"; "It is time for our K–KAPS group to meet again and forge ahead in addressing our mutual concerns"; "Let's maintain our attendance and keep working together until we are satisfied that the need for our combined efforts no longer exists"; and "Your attendance will help us in our efforts to resolve the problems that surround us and complicate our lives." Additionally, Lantz assisted K–KAPS by typing, copying, and mailing communications to K–KAPS members. Moreover, the City Council paid for the postage. Lantz attended approximately 75% of the K–KAPS meetings from the mid–1990s until the association ceased to meet in 1999.

## B. Keagy Becomes Director of K–KAPS

Layton was the director of K–KAPS until the mid–1990s, when Keagy became the director at the request of Lantz. Keagy had owned a 12–unit apartment complex in the K–KAPS area from 1982. When asked at his deposition about his duties and responsibilities as director of K–KAPS, Keagy responded, "Nobody ever gave me an agenda or a list of anything. It was up to me what did I see fit to do." (Keagy Depo. at 121). Keagy set the agenda for the K–KAPS meetings. (*Id.* at 123). Keagy was not an employee of the City, nor did he receive compensation for his work as the K–KAPS director. As such, the city did not give Keagy any guidelines as to what he could or could not do as K–KAPS director.

Keagy was a particularly vigilant association director. For example, he called apartment owners and advised them to get rid of problem tenants, asked owners why they did not attend the K–KAPS meetings, told building managers to clean up trash, and compiled the "wish well" list.[4] In addition, Keagy advocated that area owners not rent to participants in the Section 8 Prototype, which assists recovering substance abusers, because the program was too risky.[5] Finally, Keagy recommended the use of Darrel Waltman's security services, even though police assessments indicated that Waltman was running an unethical operation, assaulting people without cause, and conducting unnecessary high-speed chases.

Keagy also sent a number of written communications to K–KAPS members. On June 6, 1996, Keagy sent a letter that

---

**3.** Defendants have objected to this evidence as not properly authenticated. The Friedel Declaration authenticates these documents. Although the Declaration refers to the documents with the different bate-stamp numbers, the Declaration adequately describes the attached documents to properly authenticate them. *See* Fed.R.Evid. 901.

**4.** This list contained the names of persons who had either been evicted from a K–KAPS

rental unit, or who had otherwise left the neighborhood on unfavorable terms. The list was referred to as the "wish well" list because property owners were to wish these individuals well, rather than rent apartments to them.

**5.** Defendants' objections based on relevance, unfair prejudice, and statute of limitations are hereby overruled.

accompanied a K–KAPS meeting agenda. In that letter he stated, "Don't let government regulations and greedy lawyers intimidate you to rent to some one you don't want to rent to." A K–KAPS newsletter written by Keagy and dated October 24, 1996, states, "Remember, we, the owners have the final word as to who gets the apartments.... Nobody can force us to rent to someone we don't want to." Keagy repeatedly made statements to the effect that owners should not rent to "undesirables," i.e., individuals who did not pay their rent, who moved owing rent, who damaged the property, who brought crime and drugs into the area, and who intimidated other tenants.

In 1997, Lantz began reviewing the content of the written material submitted by the director of K–KAPS for distribution to K–KAPS members and decided to edit the materials due to the presence of grammatical errors and what she perceived as a negative tone. Keagy was indifferent to Lantz's edits. (Keagy Depo. at 172: "If they want to change it, I don't care."). The agendas that Keagy prepared and that Lantz edited were mailed with the K–KAPS logo at the top, and the Pomona City Hall address at the bottom. These agendas were sent to K–KAPS members in City Council envelopes that listed the return address as the Office of the City Council.

## C. Police Booking Photos Disseminated at K–KAPS Meetings

Lantz was present at a K–KAPS meeting where City of Pomona Police Depart- ment Booking photos were disseminated; such booking photos were also circulated at more than one K–KAPS meeting. The police helped identify by name those residents of the area who had been investigated or arrested by the police. Keagy advised apartment owners that they should not rent to persons in the photographs, and attempted to obtain more police information on prospective tenants.[6]

On October 21, 1997, Keagy sent a letter to a property owner asking the owner to evict one of his tenants. The tenant's son was living in her apartment when he was arrested for attempted murder of another K–KAPS resident. Keagy sent a copy of this letter to the police department, and the police department followed up with a similar letter to the property owner calling for the tenant's eviction. The letter threatened to require an apartment to remain vacant for a period up to one year.

## D. October 1, 1998, K–KAPS Meeting

Keagy chaired the K–KAPS meetings, which typically began with an opening statement by Lantz. Also in attendance at these meetings were on-duty officers of the Pomona Police Department. One police officer testified that he believed Keagy's conduct and demeanor at the K–KAPS meetings were inappropriate; another testified that Keagy was angry any time there was a problem in the area; yet another stated that Keagy ran the meetings like a dictator.[7] Lantz agreed that

---

**6.** As a jury could infer from the evidence presented that the purpose of the dissemination of booking photos was to assist building owners in screening housing applicants, Defendants' objections to this evidence as irrelevant and prejudicial are hereby overruled.

**7.** Defendants object to this evidence as irrelevant, unfairly prejudicial, and impermissible character evidence. The Court, however, finds the evidence relevant. Moreover, although not highly probative, the evidence does not present any danger of unfair prejudice. Finally, this evidence goes to Keagy's conduct, rather than his character. As such, it is admissible.

the manner in which Keagy conducted the K–KAPS meetings was offensive.[8]

On October 1, 1998, plaintiff Cross, as well as two police officers, attended a K–KAPS meeting at which Keagy stated that he did not rent to Blacks, that Blacks were nothing but trouble, and that if K–KAPS got rid of all the Blacks, the problems relating to drugs, crime, and troublesome tenants would stop. Keagy looked directly at Cross when he made these statements, but he did not speak Cross's name or gesture toward her. Upon hearing Keagy's statements, Cross became frightened and sat frozen in her chair. Her body clenched and she was visibly shaken. Cross believed that she would be subjected to physical assault by Keagy or by the Pomona police.

After the meeting, Cross asked one of the police officers present if Keagy's comments represented the attitude that residents of Pomona, in general, had about black people, and the police officer told her to pay no attention to Keagy. According to Lantz, who later discussed Keagy's comments with him, Keagy did not believe that he had done anything wrong. Lantz continued to assist Keagy in distributing K–KAPS material and in scheduling meeting space for the group, and attended approximately half of the association's remaining meetings.

### E. Effect of Keagy's Statements on Cross

After the meeting on October 1, Cross expressed to at least one other person that she was upset by Keagy's comments. She further expressed that she no longer felt safe in Pomona. Following the meeting, Cross suffered from insomnia and headaches. As she had become frightened in Pomona and had begun to fear physical attack, Cross resigned from her job as a resident manager and moved from Pomona to San Bernardino. She subsequently filed a complaint with plaintiff IMB, who undertook an investigation that included sending fair-housing testers to a vacant apartment offered for rent by Keagy.

### F. Fair-housing Testers

IMB sent two housing testers to apply for Keagy's vacant apartment: LH, an African–American single mother of two children, and RR, a Caucasian single mother of two children.

LH contacted Keagy on the morning of October 27, 1998, and arranged to view the vacant apartment the next morning. LH arrived and knocked on the door to the vacant apartment, and was eventually greeted by Keagy, who came down from an upstairs apartment. Keagy showed LH the apartment, which was still in need of cleaning. Keagy first informed LH that the $450 monthly rent included all utilities, and then told her that he would require a $300 security deposit, a $20 key deposit, and a $15 credit check fee. LH viewed the laundry area and parking area. Keagy then informed LH that someone had been murdered across the street, and that the retaliation for that murder had resulted in a fire in one of the carports in the alley. Keagy further informed LH that the security deposit would not be returned unless she stayed at least twelve months, and that he would check her history for previous evictions. Finally, Keagy told LH that she would be required to submit to a drug test before she could rent the apartment. LH left the apartment with a rental application.

RR also contacted Keagy on the morning of October 27, 1998, and arranged to view the vacant apartment the next morn-

---

ing. RR arrived and found the door to the apartment open. She called out, and Keagy greeted her. Keagy told her that the vacant apartment was unit #2 and that she was welcome to go in and view it. Keagy provided the same information regarding the amounts of the rent, deposits, and fees to RR as he did to LH. Keagy asked if she had been evicted in the past, and she said that she had not. Keagy gave her a rental application, and told her that the most important thing on the application was a question regarding her willingness to submit to a drug test. RR responded that she would be willing to do so, but inquired whether that requirement was legal. Keagy responded that it was. Keagy showed RR the carports and the laundry room. Keagy stated that five years ago the neighborhood was pretty bad, but that he and other owners had gotten together with the City Council to keep out the "undesirables." [9]

### G. Keagy's Resignation

In May 1999, Keagy resigned as director of K–KAPS. After his resignation, the group met only one other time and then largely ceased to exist.

### H. Resources Expended by IMB

IMB diverted human resources to opposing the activities of Keagy and K–KAPS. The following chart illustrates the extent of IMB's diversion of staff time:

| Staff Member/Title | Amount of Time | Approximate Time Frame | Description |
|---|---|---|---|
| Betty Davidow, Executive Director | 24.2 hours | 1995–1996 (fiscal year) | attending K–KAPS meetings, preparing and delivering workshop to K–KAPS members regarding fair housing laws |
| | 12.3 | 1996–1997 (fiscal year) | reviewing K–KAPS agendas and documents, preparing and reviewing correspondence, telephone conferences |
| | 1.8 | 1998 (calendar year) | meeting with K–KAPS members and overseeing IMB's testing efforts |
| | 3.6 | 1999 (calendar year) | devising enforcement strategies, reviewing records requests, reviewing correspondence |
| Jess Terres, Fair Housing Coordinator | .1 | 1997 | reviewing letter from City |
| | 7.5 | 1998 | coordinating testing; providing information to attorneys; research regarding Keagy's property ownership |

9. Defendants have objected to this evidence as both irrelevant and unfairly prejudicial. Evidence of fair-housing testing, however, is routinely admitted in cases filed under the federal Fair Housing Act and other anti-discrimination statutes. *See e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *City of Chicago v. Matchmaker Real Estate Sales Center, Inc.,* 982 F.2d 1086 (7th Cir.1992). Moreover, evidence of Keagy's disparate treatment of fair-housing testers, which is of high probative value, certainly does not *unfairly* prejudice Defendants. Finally, the Court has in no way relied on the test results as evidence of Keagy's character. To the contrary, this evidence goes to the *actions* taken by Keagy in his capacity as a landlord and/or agent of the City.

| | 13.6 | 1999 | working toward conciliation with K–KAPS, records requests, preparing information for attorneys |
|---|---|---|---|
| Omar Barraza | 18.5 | 1993–1994 | fair housing workshops |
| Laura Harrison–Tull | 3 | 1995 | attending K–KAPS meetings and preparing correspondence |
| Candace Berry | 12 | 1995–1996 (fiscal year) | preparing and presenting two fair housing workshops |
| Veronica Rodriguez | 1.5 | 1998 | reviewing testing |
| Aracely Torres | 10 | 1998 | coordinating the testing |
| Monica Lopez | 3.9 | 1999 | copying files for attorneys |
| Various | 157 | 1999 + | in connection with present action |

### III. Summary Judgment Standard

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude a grant of summary judgment. *Harper v. Wallingford*, 877 F.2d 728 (9th Cir.1989).

The Court construes all evidence and reasonable inferences drawn therefrom in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995).

### IV. Standing

#### A. Generally

■ Article III of the Constitution confers jurisdiction in the federal courts over "cases" and "controversies." The Supreme Court recently observed, "One element of the case or controversy requirement is that [plaintiffs] ... must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). Standing is therefore a threshold requirement that must be satisfied by every plaintiff who invokes the jurisdiction of a federal court. *See also, Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343(1975).

■ The standing inquiry in most federal cases involves a determination of whether the plaintiff has met "both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." *Id.* First, a plaintiff invoking federal jurisdiction must satisfy the "case or controversy" requirement, which is the

"irreducible constitutional minimum," and is an "essential and unchanging part ... of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In order to satisfy this constitutional requirement, a plaintiff must be able to demonstrate

> [*first,*] an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; *second,* there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly traceable to the challenged action of the defendant ..." *Third,* it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560–561, 112 S.Ct. 2130. Each of these elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Bennett v. Spear*, 520 U.S. 154, 167–168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citing to *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130).

▮Aside from the constitutionally imposed requirements of standing to sue in federal court, the federal judiciary has also largely adhered to a set of judicially self-imposed prudential limitations to standing that focus primarily on a concern about the proper limits on federal jurisdiction. *See Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 74 (3d Cir.1998). The crux of these principles is that even when a plaintiff has alleged injury sufficient to meet the "case or controversy" requirement of Article III, such plaintiff cannot merely rest his claim to relief on the legal rights or interest of other parties, or of some large class of citizens that shares in a generalized grievance. *Seldin,* 422 U.S. at 499–500, 95 S.Ct. 2197. These prudential limitations therefore prevent the courts from being called upon to decide "abstract questions of wide public significance...." *Id.*

▮Although a plaintiff invoking the jurisdiction of a federal court will generally have to allege or demonstrate (depending on the stage of the litigation) facts sufficient to establish standing under both Article III and the relevant prudential limitations, Congress intended that standing under the Fair Housing Act be limited only by Article III, and that prudential barriers to standing under the Act may not be erected. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Indeed, the "sole requirement for standing to sue [under the FHA] is the Article III minimum of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a 'distinct and palpable' injury." *Id.* Accordingly, the inquiry into whether an organization has standing to bring suit under the FHA is the same as that for an individual: the plaintiff must have alleged "such a personal stake in the outcome of the controversy" as to warrant his or its presence in federal court *Id.* at 378–379, 102 S.Ct. 1114.

## B. IMB's Standing

▮Because this matter is before the Court on a Motion for Summary Judgment, the Court must decide whether IMB has demonstrated, not merely alleged, "distinct and palpable injury" sufficient to satisfy Article III's "case or controversy" standing requirement. *See Fair Housing Council,* 141 F.3d at 75.

Plaintiff relies heavily on *Havens* in asserting that it suffered "two distinct but related injuries as a result of the discriminatory housing practices alleged by plain-

tiffs." In *Havens,* a fair housing organization called Housing Opportunities Made Equal ("HOME") brought suit against Havens Realty Corp., alleging that Havens' practices of racial "steering" violated the FHA. 455 U.S. at 363, 102 S.Ct. 1114. On defendant Havens' motion to dismiss, which alleged that HOME did not have standing to prosecute its claim, the Supreme Court held that because HOME had alleged that as a result of the "steering," its counseling and referral services had been frustrated with a consequent drain on its resources, HOME had sufficiently alleged the injury required for standing under Article III. *Id.* at 379, 102 S.Ct. 1114. The Court explained,

> If, as broadly alleged, [Havens'] practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests.

*Id.*

While *Havens* arose on the defendant's motion to dismiss the complaint for failure to state a claim, the issue of standing before *this* Court arises from Defendants' motions for summary judgment. Accordingly, in order to defeat summary judgment, Plaintiff must provide something more than "naked allegations." *Fair Housing Council,* 141 F.3d at 76 (citing to *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130). In this case, Plaintiff IMB has provided evidence of injury that closely mirrors the injury alleged by HOME in *Havens.* Just as HOME alleged that its activities had been disrupted as a result of defendant Havens' discriminatory practices, and that such disruption resulted in a drain of the organization's resources, so, too, has Plain-

tiff demonstrated that as a result of Defendants' discriminatory housing practices, Plaintiff was forced to divert funds away from other activities in order to combat Defendants' actions. Based on the following evidence, the Court finds that Plaintiff IMB has adequately substantiated its allegations that it has suffered an "actual and palpable" injury that would confer standing to bring this action.

Plaintiff alleges that its ability to further its mission was substantially frustrated by Defendants' allegedly discriminatory conduct. According to Plaintiff's Declaration, IMB's mission is to identify, investigate, and counteract all forms of discriminatory housing practices. Where such discriminatory practices have "perceptibly impaired [a fair housing organization's ability to carry out its mission], there can be no question that the organization has suffered an injury in fact." *Havens,* 455 U.S. at 379, 102 S.Ct. 1114. The Court finds that Plaintiff has sufficiently demonstrated that its mission was perceptibly impaired.

Plaintiff contends that it has suffered further injury because it has been forced to divert significant resources away from other activities it would normally have undertaken in order to combat Defendants' alleged conduct. Specifically, Plaintiff alleges that it spent over 112 hours dealing with K–KAPS before this suit was ever filed and that it has devoted in excess of 157 hours since the inception of this litigation.

Defendant Keagy cites *Fair Housing Council* in support of his contention that Plaintiff has failed to demonstrate a causal nexus between Defendants' alleged misconduct on one hand and the need for Plaintiff to divert the resources alleged to constitute the actual injury on the other. In *Fair Housing Council,* plaintiff housing organization argued that it had standing to sue a newspaper for violating the FHA's

prohibition on discriminatory housing advertisements because the organization had diverted resources into implementing a remedial educational campaign. 141 F.3d at 77. Affirming the district court's grant of summary judgment to defendant newspaper as to the advertising claim, the Third Circuit held, "[a]lthough pressed to do so in discovery and in oral argument before us, the [organization] was unable to establish any connection between the allegedly discriminatory advertisements underlying this suit and the need for implementation of a remedial educational campaign." *Id.*

Unlike the plaintiff in *Fair Housing Council,* however, Plaintiff IMB has established that it devoted approximately 112 hours to various activities conducted in direct response to Defendants' allegedly discriminatory housing practices. Included within that expenditure of resources are the nearly twenty hours spent by several IMB personnel coordinating or reviewing the fair-housing testing conducted at Keagy's vacant apartment subsequent to the October 1st meeting. Accordingly, while the causal link between the defendant's allegedly unlawful conduct and plaintiff organization's remedial measures may have been absent in *Fair Housing Council,* it is clearly present in this case.[10]

In sum, Plaintiff IMB has satisfied the threshold requirement of demonstrating that it has suffered some distinct and palpable injury as a result of the defendants' allegedly discriminatory housing practices. From nearly the inaugural meeting of K–KAPS, through the coordination of fair-housing testing after Defendant Keagy

made the allegedly unlawful comments on October 1, 1998, Plaintiff was forced to divert resources into countering Defendants' conduct. The Court accordingly finds that Plaintiff IMB has the requisite standing to assert these claims under the FHA.

## C. Cross's Standing

■ In order to establish standing under the FHA, a plaintiff need not prove that she was the target of discrimination. To the contrary, any person "harmed by discrimination, whether or not the target of the discrimination, can sue to recover for his or her own injury." *San Pedro Hotel v. City of Los Angeles,* 159 F.3d 470, 475 (9th Cir.1998) (citing to *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 212, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). Accordingly, the Court must determine whether Plaintiff Cross has sufficiently demonstrated the sort of "distinct and palpable" injury necessary to confer standing to bring suit under the FHA. *See Fair Housing Council,* 141 F.3d at 75.

In *San Pedro Hotel,* two hotel owners ("the Fentises") brought suit against the City of Los Angeles, alleging that as a result of the City's discrimination against the mentally ill, the Fentises were injured in that they were prevented from selling a hotel to their intended purchaser, a developer of housing for the mentally disabled. 159 F.3d at 472. Believing that the Fentises lacked standing to sue the City for substantive violations of the FHA, the District Court dismissed those portions of the

---

**10.** There is disagreement among the Courts of Appeals as to whether the "injury" of expending litigation costs is, by itself, sufficient to confer standing to bring suit under the FHA. *See Village of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir.1990) (only injury required for standing under Act is deflection of resources into legal efforts to combat discrimination); *but see Spann v. Colonial Village, Inc.,* 899

F.2d 24, 27 (D.C.Cir.1990) (organization cannot manufacture the necessary injury by expending resources on underlying litigation). This Court, however, need not address this question because it finds that the resources expended by Plaintiff IMB, even without the costs of this litigation, comprise an injury sufficient to confer standing.

complaint, allowing leave to amend only the allegation of retaliation. *Id.* at 474. On appeal, the Ninth Circuit reversed the dismissal, holding that in order to establish standing under the Act, the Fentises were required to show only "that the City interfered with the housing rights of the mentally ill and that, as a result, the Fentises suffered an actual injury." *Id.* at 475. The court further explained, "As potential sellers of the property who were unable to sell their property to a buyer because of the City's allegedly improper interference with an HUD loan, the Fentises meet this test." *Id.*

In the present case, it is uncontroverted that after witnessing Defendant Keagy's comments and demeanor at the October 1st meeting, Plaintiff Cross became so emotionally distraught that she felt forced to quit her job as a resident manager and move away from Pomona, suffering both economic and non-economic injury as a result. Non-economic injury can also support standing to sue under the FHA. *See Trafficante,* 409 U.S. at 208, 93 S.Ct. 364; *Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Indeed, the mere "stigmatization" that results from being labeled as a member of an inferior class of citizens has repeatedly been held sufficient to confer standing. *See Trafficante,* 409 U.S. at 208, 93 S.Ct. 364 (tenants who alleged that building owner's discriminatory policies "stigmatized" them as residents of a "white ghetto" stated sufficient actual injury); *see also Smith v. City of Cleveland Heights,* 760 F.2d 720, 722 (6th Cir.1985) (black resident who argued that his city's discriminatory policy branded him as "less desirable" than whites stated adequate injury).

In this case, as in *Smith,* Plaintiff Cross has demonstrated that after witnessing Defendant Keagy's conduct, as well as Defendant City's continued assistance to the association after the October 1st meeting, she felt that both her neighborhood and her city had branded her as less desirable than whites. The physical and emotional upset that accompanied the stigma of being considered inferior by the director of Cross's own neighborhood association, as well as by the city that continued to support the association, are a far cry from the kind of "abstract stigmatic injuries" that have been held insufficient to establish standing. *See Wilson v. Glenwood Intermountain Properties, Inc.,* 98 F.3d 590, 596 (10th Cir.1996) (citing to *Allen v. Wright,* 468 U.S. 737, 766, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)).

Whether Plaintiff has standing under § 3604(c) is a bit less clear. Subsection (c) makes it unlawful to "make ... any ... statement ... with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference ..." (1996). At least two courts have held that the mere receipt of a statement or advertisement proscribed by § 3604(c) confers the standing required to sue under that section. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 904 (2d Cir.1993); *Saunders v. General Services Corp.,* 659 F.Supp. 1042, 1053 (E.D.Va.1987). Other courts, however, have held that such receipt, by itself, is insufficient to confer standing. *See Wilson,* 98 F.3d at 595; *see also Spann,* 899 F.2d at 29 (Ginsburg, J., expressing doubt as to whether Congress intended "to confer a legal right on all individuals to be free from indignation and distress."). However, even those courts that doubt whether exposure to discriminatory speech, by itself, confers standing, recognize that a plaintiff acquires standing if such speech "deterred her from seeking

housing in the advertised property." *Spann*, 899 F.2d at 29. Although Plaintiff Cross has not alleged that she was ever interested in living in one of Defendant Keagy's apartments, she has demonstrated that Keagy's alleged misconduct and Defendant City's continued support of the organization were the motivating factors behind Cross's decision to vacate her apartment in the K–KAPS neighborhood. Accordingly, the Court finds that Plaintiff Cross also has the requisite standing to bring suit under 42 U.S.C. § 3604(c).

### V. Agency

Plaintiffs argue that even if Defendant City did not itself commit specific acts in violation of federal and state fair housing and anti-discrimination laws, the City is nonetheless liable for any unlawful acts committed by Defendant Keagy, who, according to Plaintiffs, was an agent of the City during his tenure as director of K–KAPS.

■■■ Whether an agency relationship exists for purposes of the Fair Housing Act is determined under federal law in order to "avoid predicating liability for Fair Housing Act violations on the vagaries of state law." *Harris v. Itzhaki*, 183 F.3d 1043, 1054 (9th Cir.1999) (citing to *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 fn. 13 (2d Cir.1994)). In determining whether an agency relationship exists, therefore, courts have generally looked to the definition of "agency" provided by the Restatement (Second) of Agency (1958) ("the Restatement"). *See e.g., General Building Contractors Assn. v. Pennsylvania*, 458 U.S. 375, 392, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (applying Restatement to analysis of similar civil rights action under 42 U.S.C. § 1981). In addition, HUD has promulgated its own definition of "agency," which closely resembles the Restatement's definition.[11] *See Harris*, 183 F.3d

at 1054 (applying HUD standard to FHA claim). As it is well established that the question of agency should be submitted to the jury unless the factual record is utterly devoid of support for a finding of agency, *see Harris*, 183 F.3d at 1054, this Court must determine whether Plaintiffs have provided any evidence upon which a jury could premise a finding that Keagy was, in fact, acting as an agent of the City when he engaged in discriminatory conduct at the October 1st meeting.

According to the Restatement, agency "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Rest.* (2d) *of Agency*, § 1. In order to satisfy the Restatement definition, Plaintiffs must have produced evidence from which a jury could find: (a) Defendant City, the alleged principal, manifested that Keagy shall act for it; (b) Keagy, the alleged agent, manifested his acceptance of such authority; and (c) both parties understood that the City was to exercise a degree of control over Keagy's activities when he was acting as the City's agent. *See Cabrera*, 24 F.3d at 386 (citing to *Rest. (2d) of Agency*, § 1 cmt. b). Similarly, in order to satisfy HUD's definition of agency, a jury must be able to at least infer from the proffered evidence that the City manifested to Keagy that he was "authorized to perform an action on behalf of [the City] regarding any matter related to … real estate-related transactions." 24 C.F.R. § 100.20(b).

■■■ Plaintiffs correctly note that the City's vicarious liability may rest upon an actual agency relationship or an apparent agency relationship. *See Pinchback v. Armistead Homes Corp.*, 689 F.Supp. 541, 550–551 (D.Md.1988), *vacated in part on*

---

11. HUD's definition of "agency" is found at 24 C.F.R. § 100.20.

*other grounds*, 907 F.2d 1447 (4th Cir. 1990), *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990). Actual agency exists where: (a) a principal manifests to another that the other has the authority to act on the principal's behalf and subject to the principal's control; and (b) the other, or agent, consents to act on his principal's behalf and subject to the principal's control. *See In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir.1984); *Armistead*, 689 F.Supp. 541, 550 (D.Md.1988). Apparent agency, however, unlike actual agency, which exists whether or not the third party knows of or suspects an agency relationship, "depends in large part upon the representations made to the third party and upon the third party's perception of those representations." *Armistead*, 689 F.Supp. at 551 (citing to *Williams v. Washington Metro. Area Transit Authority*, 721 F.2d 1412, 1416 (D.C.Cir.1983)). Indeed, while an actual agency relationship can exist absent any involvement of a third party, an apparent agency exists only to the extent that a third party reasonably believes the relationship to exist. *Id.* (citing to *Rest.* (2d) *of Agency*, § 8 cmt. c).

 Contrary to Defendant City's contention, Plaintiffs have presented evidence from which a jury could reasonably find that the City manifested its desire for—or *authorized*—Keagy to exercise at least some authority on behalf of the City, and that Keagy accepted the proffered authority, thereby creating an actual agency relationship.[12] For example, Plaintiffs' evidence indicates that, from early in K–KAPS' existence, the City took a special interest in assisting the organization's activities: Paula Lantz attended nearly three quarters of the meetings, arranged for Pomona police to speak at the meetings, personally invited area building owners to meetings, referred to K–KAPS as "our K–KAPS," printed K–KAPS correspondence on City stationery, and mailed the association's agendas using City postage. Moreover, Plaintiffs have also provided evidence that when Kathryn Layton stepped down as director of K–KAPS, Paula Lantz specifically asked Keagy to replace Layton. Accordingly, a jury might reasonably conclude that the City authorized Keagy to act on its behalf at the association's meetings.

Similarly, Plaintiffs have provided evidence that after learning he was not being represented by Defendant City's counsel in this action, Keagy appeared surprised and stated that he "didn't do this on his own," and that he was doing the City a favor by chairing the association.[13] Such evidence could certainly support a finding that Keagy accepted the authority to serve as the City's representative at K–KAPS meetings. Moreover, a jury could also reasonably find that when Lantz, an official representative of the City, asked Keagy to become the director of K–KAPS, the City thereby "authorized" Keagy to act on its

**12.** Defendant cites *Harris* (owner held liable for acts of tenant who routinely acted as agent by showing vacant apartments and collecting rent); as well as *U.S. v. Balistrieri*, 981 F.2d 916, 930 (7th Cir.1992) (owner held liable for actions of rental agent); and *Hudson v. Nixon*, 57 Cal.2d 482, 20 Cal.Rptr. 620, 370 P.2d 324 (1962) (wife held liable for co-owner husband's actions), in arguing that its relationship with Keagy was "entirely distinguishable" from those that courts have held to satisfy the "agency" criteria of both the Restatement and the HUD regulations. While the relationship in the present case is probably less common than the typical owner-agent or owner-co-owner relationships, the distinction is not dispositive as long as the jury may find that the alleged agent was *in some way* authorized to act on the principal's behalf.

**13.** Defendants' objections to this evidence as irrelevant and prejudicial are hereby overruled.

behalf in dealings with K–KAPS members within the meaning of 24 C.F.R. § 100.20. Accordingly, as Plaintiffs have met their burden of production on the issue of agency, summary judgment in favor of Defendant City is denied.[14]

## VI. First Amendment Protection: The Nature of Keagy's Speech

Defendants assert that Keagy's speech at the October 1st meeting was constitutionally protected, and therefore cannot serve as a basis for liability on any of Plaintiffs' claims. Keagy contends his comments concerning both the desirability of black tenants in general as well as the crime and drug problems associated with African–Americans were merely statements of opinion and are protected as such under the First Amendment. Keagy further claims that his statement that he does not rent to black tenants, although not an opinion, was not the sort of commercial speech that is entitled to less protection under the First Amendment than political or ideological speech. Similarly, Defendant City argues that even if the Court were to find that Keagy was acting as an agent or representative of the City at K–KAPS meetings, the City cannot be found liable in the present action because Keagy's remarks enjoyed constitutional protection.

■ The Court has already concluded that there is a triable issue of fact as to whether an agency relationship existed between the defendants when Keagy made his discriminatory comments at the October 1st meeting. Accordingly, the Court must first ask: (a) whether municipal entities are entitled to First Amendment protection; and (b) if not, whether speech by agents or employees of municipal entities is also unprotected when made in the context of the agency relationship. If neither cities nor individuals acting in their capacities as agents of cities are entitled to First Amendment protection, then the Court need not reach the question of whether Keagy's comments constituted commercial speech.[15]

In *Creek v. Village of Westhaven*, 80 F.3d 186, 192 (7th Cir.1996), the Court of Appeals recognized that, as the Supreme Court has not expressly addressed the

14. Although Plaintiffs have also presented evidence from which a jury could reasonably conclude that Plaintiff Cross perceived an apparent agency relationship between the two defendants, the Court need not delve beyond its determination that a jury could find an *actual* agency relationship existed between Keagy and the City at the time of the October 1st meeting.

15. Although the Court does not reach Defendants' contention that Keagy's statements were non-commercial, the argument is not without merit. The U.S. Supreme Court has held that commercial speech does "no more than propose a commercial transaction." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). Similarly, the California Supreme Court has concluded that "commercial speech is that which has but one purpose—to advance an economic transaction." *Spiritual Psychic Science Church of Truth v. City of Azusa*, 39 Cal.3d 501, 511, 217 Cal.Rptr. 225, 703 P.2d 1119 (1985). In *Church of Truth*, the court explained its holding that fortune-telling was not merely commercial speech as follows: "... the words convey thoughts [and] opinions...." *Id.* at 508, 217 Cal.Rptr. 225, 703 P.2d 1119.

It is certainly possible that when Keagy explained that he does not rent to African–Americans and urged others to adopt his views and practices, his words communicated a "message beyond that related to the bare economic interests of the parties." *Id.* at 511, 217 Cal.Rptr. 225, 703 P.2d 1119. However, because a jury might find that Keagy was an agent of the City when he spoke at the meeting, and because the Court concludes that neither government entities nor their agents acting in the context of the agency relationship are entitled to First Amendment protection, the non-commercial-speech-argument is insufficient to warrant summary judgment in favor of Defendants.

question of whether government entities are entitled to First Amendment protection, it is not "out of the question that a municipality could have First Amendment rights." Upon further examination, however, the court summarized: "Only a few cases address the question whether municipalities or other state subdivisions or agencies have any First Amendment rights. All but one, and that not a case against a municipality, answer 'no.' " *Id.* Clearly leaning toward the majority, the Seventh Circuit refused to allow a government defendant to assert the First Amendment as a shield against liability:

> We do not think that the county could interpose the First Amendment as a defense. Speech by government ... cannot be equated for all purposes to speech by an individual. It remains an official act, and when its purpose and tendency are, as alleged here, *to promote discrimination* that violates [federal law], so too does the act. A contrary conclusion would permit government to undermine the duties that [federal law] imposes upon it. . . .

*Id.* at 194 (emphasis added).

The Fifth Circuit has also held that government entities do not have First Amendment rights. See *Muir v. Alabama Educational Television Commn.*, 688 F.2d 1033, 1041 (5th Cir.1982). Addressing whether a public television station could assert the First Amendment as a defense against civil liability, the court concluded,

> Under the existing statutes, public licensees such as ... the University of Houston ... possess the same rights and obligations to make free programming decisions as their private counterparts; *however*, as state instrumentalities, these public licensees are without the protection of the First Amendment.

*Id.* (Emphasis added). Similarly, after the 1980 split, the Eleventh Circuit followed its predecessor, holding, "[i]ndeed, the First Amendment protects citizens' speech only from government regulation; government speech itself is not protected by the First Amendment." *NAACP v. Hunt*, 891 F.2d 1555, 1564 (11th Cir.1990) (citing to *Columbia Broadcasting System, Inc. v. Democratic Natl. Comm.*, 412 U.S. 94, 139, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring)).

As the Seventh Circuit noted in Creek, one California court has held that government entities and their employees are entitled to limited protection under the First Amendment. In *Nadel v. UC Regents*, 28 Cal.App.4th 1251, 1259, 34 Cal.Rptr.2d 188 (1994), the court focused heavily on avoiding a legal rule that would "inhibit the vigor and variety of public debate" (citing to *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Employing a makeshift balancing test, the court weighed: (a) the rights of listeners to receive a broad spectrum of viewpoints; (b) the relative vulnerability of individuals suing the government for defamation vs. that of a public figure bringing suit against a non-government entity; and (c) the argument that the First Amendment simply does not afford government any protection. *Id.* at 1261–67, 34 Cal. Rptr.2d 188. Applying the three prongs of this test to the facts before it, the court concluded that it is "appropriate to extend the limited First Amendment protection of the *New York Times* standard to government speech, so that government may be held liable for defamation of a public official or public figure only where there is knowledge of falsity or reckless disregard of the truth." *Id.* at 1267, 34 Cal.Rptr.2d 188.

Even *Nadel*, however, does not help Defendants in the present case. *Nadel* was only a defamation case and as such did not address whether government entities are entitled to First Amendment protection

with respect to suits brought under fair housing and anti-discrimination statutes. The opinion includes nothing that counters the Seventh Circuit's reasoning that a legal rule permitting the government to invoke the First Amendment as an aid to promote discrimination is unacceptable. Moreover, the protection afforded the government defendant in *Nadel* was modeled after the limited protection established for public officials and public figures in *New York Times.* Plaintiff Cross, however, is neither a public official nor a public figure. Indeed, the Supreme Court has expressly stated that private individuals are more vulnerable to injury than their counterparts in public life and are therefore entitled to greater protection. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Accordingly, the holding in *Nadel* is inapposite to this case.

In sum, the Court concludes that neither Defendant City nor Defendant Keagy when acting in his capacity as the City's agent—as the jury might find that he was—may impose the First Amendment as a defense against the claims brought by Plaintiffs in this action.

### VII. Claims Under Federal Fair Housing Law

#### A. § 3604(a)—Making Housing Otherwise Unavailable

##### 1. Standard

Section 3604(a) provides:

[I]t shall be unlawful—(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(a) (emphasis added). Plaintiffs' claims under this provision are based on the phrase, "otherwise make [housing] unavailable." Cross asserts that

Keagy (and therefore, Keagy's principal, the City) made housing otherwise unavailable to her with his October 1, 1998, statements. IMB asserts that the City otherwise made housing unavailable to others through its support of K–KAPS.

##### 2. Direct Evidence, Indirect Evidence, and the Prima Facie Case

Defendants argue that Plaintiff has failed to establish a prima facie case of housing discrimination under § 3604(a). In many instances, to establish a prima facie case of housing discrimination, a plaintiff must show that he or she is a member of a protected class who applied for and was qualified to rent housing and who was rejected; Plaintiff must also show that the housing opportunity remained available. *Gilligan v. Jamco Development Corp.,* 108 F.3d 246 (9th Cir.1997). Neither Plaintiff meets this test.

However, Plaintiffs argue that the burden-shifting scheme is inapplicable to the present motion because it applies only in the absence of direct evidence of discrimination. Plaintiffs have presented direct evidence of discrimination in the form of Keagy's October 1, 1998, statements. As in employment-discrimination cases, a plaintiff in a housing-discrimination case may establish an inference of discrimination and therefore a triable issue of fact through either direct or indirect evidence. *See Fair Housing Congress v. Weber,* 993 F.Supp. 1286 (C.D.Cal.1997); *Texas v. Crest Asset Management,* 85 F.Supp.2d 722 (S.D.Tex.2000); *U.S. v. Branella,* 972 F.Supp. 294 (D.N.J.1997); *Coalition of Bedford–Stuyvesant Block Assn., Inc. v. Cuomo,* 651 F.Supp. 1202 (E.D.N.Y.1987).

 Plaintiffs are not required to establish the elements a prima facie case of housing discrimination in this instance. Plaintiffs have presented direct evidence of discrimination, and, in any event, the ele-

ments of the prima facie case as cited by Defendants appear to be inapplicable here. The elements of the prima facie case very clearly address themselves to a classic form of housing discrimination—a plaintiff applies for housing and is refused because of race (or other protected status). For example, the plaintiffs in *Gilligan*, which set forth the elements of the prima facie case outlined above, were prospective tenants who were denied housing based on the landlord's policy not to rent to those who received benefits from the Aid to Families with Dependent Children (AFDC) program. The plaintiffs argued that the purpose or effect of the policy was to discriminate against families with children. In contrast, Plaintiffs here base their claims on the provision of § 3604(a) that prohibits making housing otherwise unavailable and the elements of the prima facie case [16] cited by Defendants simply do not address Plaintiffs' claim. *See Traffi-cante*, 409 U.S. at 212, 93 S.Ct. 364 (1972) (a plaintiff need not be the target of discrimination to suffer cognizable injury under the FHA).

### 3. Plaintiff Cross's Claim

 Plaintiff Cross has provided direct evidence of discrimination, as well as evidence that she subsequently resigned from her resident manager position and moved away from Pomona as a result of Keagy's statements. This raises a triable issue of fact as to whether Defendants made housing "otherwise unavailable" to Cross.

### 4. IMB's Claim

Plaintiffs make four arguments as to why summary judgment is not appropriate as to IMB's § 3604(a) claim.[17] IMB's ar-

guments are based on four sections of the HUD regulation that interprets § 3604(a): a) 24 C.F.R. § 100.70(d)(4); b) § 100.70(a); c) § 100.70(c)(1); and d) § 100.70(d)(2). In relevant part, § 100.70 provides:

(a) It shall be unlawful, because of race, color, religion, sex, handicap, familial status, or national origin, to restrict or attempt to restrict the choices of a person by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as to perpetuate, or tend to perpetuate, segregated housing patterns, or to discourage or obstruct choices in a community, neighborhood or development.

. . . .

(c) Prohibited actions under paragraph (a) of this section, which are generally referred to as unlawful steering practices, include, but are not limited to: (1) Discouraging any person from inspecting, purchasing or renting a dwelling because of race, color, religion, sex, handicap, familial status, or national origin, or because of the race, color, religion, sex, handicap, familial status, or national origin of persons in a community, neighborhood or development.

. . . .

(d) Prohibited activities relating to dwellings under paragraph (b) of this section include, but are not limited to:

. . . .

(2) Employing codes or other devices to segregate or reject applicants, purchasers or renters, refusing to take or to show listings of dwellings in certain areas because of race, color, religion, sex, handicap, familial status, or national ori-

---

**16.** The Ninth Circuit has indicated flexibility in determining the elements of a FHA plaintiff's prima facie case. *Harris*, 183 F.3d at 1051 (*"Adapted to this situation,* the prima facie case elements are: (1) plaintiff's rights are protected under the FHA; and (2) as a

result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury.") (emphasis added).

**17.** Plaintiffs assert these arguments as to Plaintiff Cross's claims as well.

gin, or refusing to deal with certain brokers or agents because they or one or more of their clients are of a particular race, color, religion, sex, handicap, familial status, or national origin.

. . . .

(4) Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.70. Each of Plaintiffs' arguments will be addressed in turn.

### a) § 100.70(d)(4)

 Plaintiffs argue that there are triable issues of fact as to whether the City provided municipal services differently because of race. Plaintiffs point to evidence of the City's involvement with the K–KAPS landlord association in support of this argument. Specifically, Plaintiffs note that the City sponsored a landlord screening service limited only to landlords in the K–KAPS area—an area that is comprised of mostly minority residents. Plaintiffs also point to evidence that the City permitted landlords to review police booking photographs and offered advice on how better to screen prospective tenants in this area. Plaintiffs also note that the City distributed the "wish well" list for use by K–KAPS members and recommended the services of a private security force that was known to the Pomona Police Department for its unlawful conduct. The evidence of record raises an inference that the City provided different services to the K–KAPS area. Because the K–KAPS area is inhabited by predominately minority residents and because the evidence in this case raises a triable issue of fact as to whether Keagy acted in a discriminatory manner, the Court concludes that Plaintiffs have raised a triable issue of fact as to whether the City provided municipal services differently because of race.

### b) § 100.70(a)

 Plaintiffs argue that there is a triable issue of fact as to whether the City restricted or attempted to restrict a person's choices in connection with renting a dwelling in a community, neighborhood or development. For the same reasons noted in the previous section as to § 100.70(d)(4), Plaintiffs have raised a triable issue of fact under § 100.70(a) as well.

### c) § 100.70(c)(1)

 Plaintiffs also argue that the City discouraged individuals from renting a dwelling because of both race and familial status by reporting to the police the identities of children residing in the K–KAPS neighborhood. The identification of the children residing in the K–KAPS neighborhood was done ostensibly to assist the police in enforcing truancy laws. For the reasons discussed above in connection with § 100.70(d)(4), Plaintiffs have also raised a triable issue of fact under § 100.70(c)(1).[18]

### d) § 100.70(d)(2)

 Finally, Plaintiffs argue that Defendants employed codes or other devices to segregate or reject applicants, purchasers or renters. Plaintiffs have presented evidence that K–KAPS maintained a "wish well" list of former tenants who have been evicted from K–KAPS property. The list was denominated the "wish well" list because landlords were to wish well those on the list, rather than rent apartments to them. In addition to the names of individuals who had been evicted, the list also

---

**18.** This is true at least as to race discrimination. Plaintiffs have cited no authority that suggests that the City violates § 3604(a) and makes housing unavailable to families with children merely by reporting the identity of children to the police.

bore the names of persons whom Keagy deemed to be "problem" or "undesirable" tenants. Keagy was asked at his deposition regarding the "problem" or "undesirable" tenants. At one point, Keagy stated: "It's not my fault that at the time the majority of the problems were caused by African–Americans." Plaintiffs have raised a triable issue of fact regarding whether this list is a "code or other device" used to reject potential renters.

### 5. Defendants' Arguments

#### a) Scope of § 3604(a)

In response to IMB's arguments, Defendants note that otherwise making housing unavailable does not reach every act that might conceivably affect the availability of housing. Defendants cite a number of cases that support the proposition that not every act affecting the availability of housing is actionable. *See Jersey Heights Neighborhood Assn. v. Glendening,* 174 F.3d 180 (4th Cir. 1999) (holding that State's decision in selecting location for new highway through predominately African–American neighborhood did not "otherwise make [housing] unavailable"); *Clifton Terrace Assoc., Ltd. v. United Technologies Corp.,* 929 F.2d 714 (D.C.Cir.1991) (holding that elevator company's refusal to service elevators in buildings in predominantly African–American neighborhood did not "otherwise make [housing] unavailable"); *Edwards v. Johnston County Health Dept.,* 885 F.2d 1215 (4th Cir.1989) (holding that county's actions in issuing permits for establishment of substandard housing for predominately non-white migrant farm workers did not "otherwise make [housing] unavailable"); *Mackey v. Nationwide Ins. Cos.,* 724 F.2d 419 (4th Cir.1984) (holding that an insurer's refusal to underwrite hazard insurance in a predominately African–American neighborhood did not "otherwise make [hous-

ing] unavailable"); *Southend Neighborhood Improvement Assn. v. County of St. Clair,* 743 F.2d 1207 (7th Cir.1984) (holding that county's discriminatory maintenance of property purchased by tax deed, which resulted in reduced property value of surrounding homes, was not actionable under § 3604(a)). However, the City's conduct at issue in this action—tenant screening—is more closely related to, and therefore has a greater effect on, the availability of housing than the conduct at issue in the cases cited by Defendant.

#### b) Racial Steering

■ Defendant Keagy also unpersuasively argues that Plaintiffs have not, as required by § 3604(a), raised a triable issue of fact that racial steering occurred. Although Keagy provided substantially the same basic information to both testers, his treatment of the two women was significantly different. Indeed, Keagy provided the African–American tester with certain information that he withheld from the Caucasian tester, and vice-versa.

The information provided LH, the African–American woman, tended to suggest that the apartment was less desirable than it might appear without such information. For example, Keagy told LH that even though the landlords were working to better the neighborhood, the area was still not the best place in which to live. Keagy also described the area as a rough neighborhood, explaining that there had been a murder just down the street, and that the subsequent retaliation for that murder had resulted in a car fire.

Conversely, the information Keagy provided to RR, the Caucasian tester, but withheld from LH, tended to suggest that the apartment was *more* desirable than it might appear, absent such information. For example, contrary to what he told LH,

Keagy informed RR that while the neighborhood might have been bad five years before, he and the other landlords, as well as the City Council, had worked together to keep the "undesirables" away, thereby improving the living atmosphere of the neighborhood. Keagy also informed RR that when landlords have "bad tenants," they make sure other landlords know about it.

Because the Caucasian tester was provided with information that suggested the apartment was more desirable than was suggested to the African–American tester, the tester evidence presented by Plaintiffs establishes a triable issue of fact regarding racial steering.

### c) Continuing Violation

Defendants also argue that IMB's evidence prior to October 1, 1997, two years before this action's filing date, is barred by the statute of limitations. IMB argues that the continuing violation doctrine applies, and that the Court may consider all of its evidence. Defendants counter that the continuing violation doctrine does not apply when the discriminatory nature of the acts was apparent at or about the time they were committed. The Court concludes that the continuing violation doctrine applies.

 Courts have long applied a continuing violation doctrine in employment discrimination claims brought pursuant to Title VII. *See, e.g., Williams v. Owens–Illinois, Inc.*, 665 F.2d 918 (9th Cir.1982), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). The United States Supreme Court has endorsed applying the continuing violation doctrine to housing discrimination claims. *See Havens*, 455 U.S. at 380–81, 102 S.Ct. 1114. The continuing violation doctrine

allows courts to consider conduct that would ordinarily be time barred when the untimely incidents represent an ongoing unlawful practice. *Morgan v. National Railroad Passenger Corp.*, 232 F.3d 1008 (9th Cir.2000). The doctrine applies when the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period. *Id.* Such incidents of discrimination cannot be isolated, sporadic, or discrete. *Id.* In determining whether to apply the doctrine, courts look to whether there is a common type of discrimination. *Id.* At the summary judgment stage, as long as the conduct has the capacity of being considered a violation, it becomes an issue for the finder of fact. *Id.* (Holding that district court erred in granting partial summary judgment as to conduct occurring during an eight year period prior to the limitations period); *see also Anderson v. Reno*, 190 F.3d 930 (9th Cir.1999) (reversing district court's grant of summary judgment in favor of employer and holding that court erred in not considering events occurring during a nine year period prior to the limitations period).

Defendants rely on *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 (7th Cir. 1994), as well as cases from other Circuits, for the proposition that the continuing violation doctrine does not apply when the discriminatory nature of the acts was apparent at or about the time they were committed. Significantly, however, Defendants fail to distinguish, or even cite, Ninth Circuit authority regarding this issue.[19]

The Ninth Circuit has rejected the Seventh Circuit's "notice" approach to the continuing violation doctrine. *See Morgan*, 232 F.3d at 1014–15 (explicitly rejecting

---

**19.** This Court is bound to follow the decisions of the Ninth Circuit. Counsel are expected to

cite such authority when it is available.

the notice requirement of a Seventh Circuit case decided two years after *Doe* ). The *Morgan* court noted: "This court has never adopted a strict notice requirement as the litmus test for application of the continuing violation doctrine...." *Id.* at 1015. (rejecting the Fifth Circuit's analysis that included an inquiry into whether a harassing act should trigger an employee's awareness of and duty to assert his or her rights). Accordingly, the Court finds that the continuing violation doctrine applies in this instance.

**B. § 3604(b)—Discrimination in the Terms, Conditions, and Privileges of the Rental of a Dwelling**

Plaintiffs stated in their Opposition that they were no longer advancing this claim against the City. Plaintiffs do not explicitly state that they are no longer advancing this claim against Keagy; however, Plaintiffs have not opposed the City's argument that no identifiable person has been subjected to different terms, conditions, and privileges of the rental of a dwelling because of a protected status. This argument applies with equal force as to this claim as asserted against Keagy, and therefore summary adjudication in favor of both Defendants as to Plaintiffs' § 3604(b) claim is hereby **GRANTED.**

**C. § 3604(c)—Statements Indicating Preference, Limitation, or Discrimination**

Section 3604(c) contains broad prohibitions against publications, advertisements, and statements regarding the sale or rental of a dwelling that indicates a preference based on a protected status:

> [I]t shall be unlawful ... (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604(c). The parties offer extensive argument regarding whether a triable issue of fact has been raised regarding Plaintiffs' § 3604(c) claim. The Ninth Circuit case of *Harris v. Itzhaki,* 183 F.3d 1043 (9th Cir.1999), makes it clear that it has.

In *Harris,* the sole African–American resident of an apartment complex overheard a conversation between the complex's resident manager and repairman/gardener to the effect that the owners of the building did not want to rent to Blacks. The evidence obtained by subsequent fair-housing testers raised an inference of discrimination. Based on these facts, the Ninth Circuit reversed the district court's grant of summary judgment in favor of the defendant landlords as to the plaintiff's § 3604(c) claim.

 Here, the uncontroverted facts establish that Keagy published the statement at the October 1, 1998, K–KAPS meeting that he did not rent to Blacks. Evidence obtained by subsequent fair-housing testers has raised an inference of discrimination. As did the Ninth Circuit in *Harris,* this Court concludes that Plaintiffs have raised a triable issue of fact with respect to their § 3604(c) claims.

Defendants argue that *Harris* is a "stray remarks" case and is inapplicable where the statements at issue cannot be tied to the decisional process. In *Harris,* the Ninth Circuit could not find as a matter of law that the remarks were unrelated to the decisional process because the resident manager acted as a filter for the owners of the building. Therefore, her comments were related to her decision to recommend tenants. Here, the statement made by Keagy ("I do not rent to Blacks")

establishes that it was related to decisions regarding the rental of apartments. *See Harris*, 183 F.3d at 1054 ("Openly discriminatory statements merit ... straightforward treatment."). Defendants' argument is not persuasive.

**D. § 3604(d)—Misrepresenting the Availability of a Dwelling for Rent**

Plaintiffs stated in their Opposition that they were no longer advancing this claim against the City. Plaintiffs do not explicitly state that they are no longer advancing this claim against Keagy; however, Plaintiffs have not opposed the City's argument that there is no evidence of record that any Plaintiff was informed that a dwelling was unavailable.[20] This argument applies with equal force as to this claim as asserted against Keagy, and therefore summary adjudication in favor of both Defendants as to Plaintiffs' § 3604(d) claim is hereby **GRANTED**.

**E. § 3617—Interference with Fair Housing Rights**

Section 3617 prohibits interference with rights protected under the Fair Housing Act: It shall be unlawful to ... interfere with any person in the exercise or enjoyment of ... any right granted or protected by [the FHA]. 42 U.S.C. § 3617. Because Plaintiffs have raised a triable issue

of fact with respect to their other FHA claims, they have raised a triable issue of fact regarding their § 3617 claims as well.

Defendants argue that their action is protected by the First Amendment, and is therefore not actionable under § 3617. Defendants rely on *White v. Lee*, 227 F.3d 1214 (9th Cir.2000), which involved the actions of neighbors who opposed the addition of housing for the mentally disabled to their neighborhood. The Ninth Circuit held that the conduct of the neighbors was not actionable under § 3617 because it was protected by the First Amendment. However, here, the Court has concluded that there is a triable issue of fact as to whether the Defendants are entitled to First Amendment protection;[21] therefore, the Court cannot determine at this stage in the proceedings whether *White v. Lee* precludes Plaintiffs' claims under § 3617. Accordingly, summary adjudication is not appropriate as to Plaintiffs' § 3617 claim.[22]

**F. § 3608—Failing to Affirmatively Further the Purpose of the FHA**

Apparently acknowledging Defendants' argument that there is no private right of action under § 3608,[23] Plaintiffs have stated in their Opposition that they are no longer advancing this claim. Accordingly, the Court hereby **GRANTS** summary adjudication in favor of Defendants as to Plaintiffs' § 3608 claim.

---

**20.** However, the Court has already concluded that there is a triable issue of fact as to whether racial steering actionable under § 3604(a) occurred.

**21.** More specifically, the Court has concluded that the City is not entitled to First Amendment protection, and that there is a triable issue of fact as to whether Keagy was an agent of the City. Therefore, there is a triable issue of fact as to whether Keagy's statements are entitled to First Amendment protection.

**22.** Plaintiffs also argue that summary judgment is inappropriate as to their claim under

Cal.Govt.Code § 12955.7. This provision, like § 3617, is a broad prohibition against interference with the rights that are guaranteed by fair housing laws. A review of the Third Amended Complaint, however, reveals that the Plaintiffs have not asserted a claim under § 12955.7.

**23.** *See Jones v. Office of Comptroller of Currency* (D.D.C.1997), *aff'd,* 1998 WL 315581 (D.C.Cir.1998), *Puerto Rico Public Housing Admin. v. United States Dept. of Housing and Urban Dev.,* 59 F.Supp.2d 310 (D.Puerto Rico 1999).

## VIII. Claims Under California Fair Housing Law

Generally, California explicitly prohibits its fair housing laws from being construed to provide fewer rights or remedies than the FHA and its implementing regulations. *See* Cal.Govt.Code § 12955.6. Therefore, to the extent that the provisions of FEHA address the same rights as the provisions of the FHA, and to the extent that the Court has found that Plaintiffs have raised triable issues of fact as to their FHA claims, Plaintiffs have also raised triable issues of fact with respect to the corresponding FEHA claims.

### A. Cal.Govt.Code § 12955(a), (d), and (k)

Plaintiffs argue that they have raised a triable issue of fact with respect to their claims under § 12955(a) and (d). In relevant part, § 12955 provides:

> It shall be unlawful: (a) For the owner of any housing accommodation to discriminate against or harass any person because of the race, color, religion, sex, sexual orientation, marital status, national origin, ancestry, familial status, source of income, or disability of that person[;] ... (d) For any person subject to the provisions of Section 51 of the Civil Code, as that section applies to housing accommodations, to discriminate against any person on the basis of sex, sexual orientation, color, race, religion, ancestry, national origin, familial status, marital status, disability, source of income, or on any other basis prohibited by that section[;] ... (k) To otherwise make unavailable or deny a dwelling based on discrimination because of race, color, religion, sex, sexual orientation,

familial status, source of income, disability, or national origin.

Cal.Govt.Code § 12955.

At the outset, the Court notes that Plaintiffs state that they are not pursuing their claims based on § 12955(a) against the City. This is in apparent response to the City's argument that the City is not an "owner" and is therefore not subject to § 12955(a). . Defendant Keagy does not make the same argument, and, based on the uncontroverted facts before the Court, Keagy appears to be an "owner" within the meaning of § 12955(a). Accordingly, the Court hereby **GRANTS** summary adjudication in favor of Defendant City of Pomona as to Plaintiffs' § 12955(a) claim.

The City also contends that it is not subject to § 12955(d) because that subsection applies only to "any person subject to the provisions of Section 51 of the Civil Code." Section 51 of the Civil Code refers to the Unruh Civil Rights Act, which declares all persons free and equal and prohibits discrimination in employment and public accommodation. In arguing that it is not subject to § 51, the City points to Cal.Govt.Code § 12927(e), which defines the term "owner." This definition is relevant to whether § 12955(a) [24] is applicable to the City, but not to whether § 12955(d) is applicable to the City.

However, the City also contends that it is not subject to § 51 of the California Civil Code, the Unruh Civil Rights Act, because K–KAPS was not a business. As noted below, the Court agrees that K–KAPS was not a business, and therefore summary adjudication in favor of Defendants is hereby **GRANTED** as to Plaintiffs' § 12955(d) claims.

■■■ The Court notes that the substantive prohibitions of § 12955(a), (d), and (k)

---

**24.** Section 12955(a) applies only to "owners," while § 12955(d) applies to persons subject to

Cal.Civ.Code § 51.

are the same as the substantive prohibitions of § 3604(a). Therefore, because Plaintiffs have raised a triable issue of fact as to § 3604(a), they have also raised a triable issue of fact as to § 12955(a) (with respect to Defendant Keagy) and § 12955(k) (with respect to both Defendants).

### B. Cal.Govt.Code § 12955(c)

■ Like § 3604(c), Cal.Govt.Code § 12955(c) prohibits the making, printing, or publishing of any notice, statement, or advertisement that indicates a preference, limitation, or discrimination based on a protected status. Therefore, because Plaintiffs have raised a triable issue of fact as to § 3604(c), they have also raised a triable issue of fact as to § 12955(c).

### C. Cal.Govt.Code § 12955(g)

■ Plaintiffs argue that they have raised a triable issue of fact regarding their claim under Cal.Govt.Code § 12955(g), which prohibits aiding, abetting, inciting, compelling, or coercing the doing of any of the acts declared unlawful in FEHA, in violation of Cal.Govt.Code § 12955(g).[25] Defendants respond that there is no evidence of any specific or particularized act of discrimination, and therefore, there can be no aiding or abetting acts in violation of FEHA.

Plaintiffs, however, correctly contend that a violation of § 12955(g) occurs upon the mere attempt to aid or abet another's violation of FEHA: "It shall be unlawful: … For any person to aid, abet, incite, compel, or coerce the doing of any of the acts or practices declared unlawful in this section, *or to attempt to do so.*" Cal. Govt.Code § 12955(g) (emphasis added). Specifically, Plaintiffs correctly note that Keagy's city-sponsored advocacy attempted to incite other landlords to commit dis-

criminatory housing practices. Accordingly, Plaintiffs have raised a triable issue of fact as to their § 12955(g) claim.

### IX. Unruh Civil Rights Act (Cal.Civ.Code § 51)

Plaintiffs' Third Amended Complaint also stated a cause of action under California's Unruh Civil Rights Act, which is codified at Section 51 of the California Civil Code. Defendants contend that Plaintiffs have raised no triable issue of fact with regard to this cause of action, and that summary adjudication of this claim is therefore appropriate.

■ The Unruh Act provides that all persons, regardless of sex, race, color, religion, ancestry, national origin, disability, or medical condition, are entitled to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal.Civ.Code § 51. Defendants argue that, as a threshold matter, K–KAPS was not a "business establishment," within the meaning of the Unruh Act and is therefore not regulated by Section 51. The Court agrees.

■ In determining whether an organization falls within the ambit of the Unruh Act, courts must consider several factors, including: (a) what, if any, business benefits one may derive from membership; (b) the number and nature of paid staff; (c) whether the organization has physical facilities; (d) what are the purposes and activities of the organization; (e) the extent to which the organization is open to the public; (f) whether there are any fees or · dues for participation or membership; and (g) the nature of the organization's structure. *Harris v. Mothers Against Drunk Driving,* 40 Cal.App.4th 16, 46 Cal. Rptr.2d 833, 834–35 (1995).

In *O'Connor v. Village Green Owners Assn.,* 33 Cal.3d 790, 796, 191 Cal.Rptr.

---

**25.** There appears to be no FHA equivalent to this claim.

320, 662 P.2d 427 (1983), the California Supreme Court applied a similar set of factors in concluding that a condominium homeowners' association possessed "sufficient businesslike attributes to fall within the Act's reference to [business establishments]." The Court summarized the evidence of record as follows:

> The association, through a board of directors, is charged with employing a professional property management firm, with obtaining insurance for the benefit of all owners and with maintaining and repairing all common areas and facilities of the 629–unit project. It is also charged with establishing and collecting assessments from all owners to pay for its undertakings and with adopting and enforcing rules and regulations for the common good. In brief, *the association performs all the customary business functions which in the traditional landlord-tenant relationship rest on the landlord's shoulders.*

*Id.* (Emphasis added). Putting aside the argument that the "transformation of such a loosely knit protective association into a 'business' is stretching the concept of an entrepreneurial venture beyond all reason," *Id.* at 802, 191 Cal.Rptr. 320, 662 P.2d 427 (Mosk, J., dissenting), it is clear that K–KAPS possessed none of the managerial responsibilities that the association in *O'Connor* possessed. While the uncontroverted evidence establishes that K–KAPS did, at all times, have a *director* (first Layton, then Keagy), there is no evidence that the association ever had a *board* of directors vested with any authority to act on behalf of the association's members, let alone to enter into contractual arrangements with property management firms and providers of homeowners' insurance. Moreover, Plaintiffs have provided no evidence that the K–KAPS association ever adopted binding rules and regulations for its members, or that it even had the authority to do so.

K–KAPS also differed markedly from other organizations that have been held to constitute business establishments under the Act. For example, in *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal.3d 72, 77, 82–83, 219 Cal.Rptr. 150, 707 P.2d 212 (1985), the California Supreme Court held that even though the defendant boys' club was a charitable, non-profit organization, the club was nonetheless a business establishment, within the meaning of the Unruh Act, because it was a corporate entity that had a paid staff and operated a large clubhouse that was open to the public. Another court reached a similar result in *Rotary Club of Duarte v. Board of Directors*, 178 Cal.App.3d 1035, 224 Cal.Rptr. 213 (1986). There, the court held that the Rotary Club also qualified as a business establishment under the Act because of its vast, worldwide staff and its practice of disseminating a variety of international publications in which club members could purchase space for business advertisements. *Id.* at 1053–55, 224 Cal.Rptr. 213.

Because K–KAPS did not operate its own physical premises, but instead conducted its meetings in City Hall meeting rooms available to the public, and because the association was never incorporated and did not engage in any widespread dissemination of written material, neither *Isbister* nor *Rotary Club* are persuasive in the present case. Much more illustrative is the holding in *Harris v. M.A.D.D.* There, the Court of Appeal reversed summary judgment for the defendant, a local chapter of Mothers Against Drunk Driving ("M.A.D.D."), summarizing the evidence as follows:

> [A witness] stated that M.A.D.D. provides benefits to members, but he did not specify what they were. M.A.D.D. has some paid staff, but it is unclear how many staff it has and what they do. M.A.D.D. has branch offices in many

states, including California, but is unclear what facilities it maintains and how important they are to the purposes and programs of M.A.D.D. M.A.D.D. engages in telemarketing campaigns, but it is unclear what, if any, business benefits members derive from these campaigns. We do not know what other literature M.A.D.D. promulgates or what products they may produce.... Its by-laws provide for annual contributions, which are $20 per year, but it is unclear what percentage of members actually pay dues....

40 Cal.App.4th at 22, 46 Cal.Rptr.2d 833. The court concluded that because so many factual issues remained to be resolved, M.A.D.D. had not met its burden of demonstrating why it was not subject to the Unruh Act. *Id.*

In the instant case, however, no such triable issues of fact remain. Unlike M.A.D.D., K–KAPS had no paid staff. Indeed, not even Keagy received compensation for serving as the association's director. Unlike M.A.D.D., K–KAPS had no branch offices. In fact, the record demonstrates that the association had no *home* office, but instead met in the public meeting rooms at City Hall. Unlike M.A.D.D., K–KAPS communicated to its membership only via periodic newsletters, the "business benefits" of which were almost certainly negligible. Finally, the evidence clearly establishes what percentage of K–KAPS members paid dues: none; plaintiffs have provided no evidence that K–KAPS ever charged its members a fee to participate in association activities.

In sum, Plaintiffs have simply provided no evidence from which a jury could con-

clude that K–KAPS was a "business establishment" within the meaning of Section 51 of the California Civil Code. Accordingly, summary adjudication of Plaintiffs' Unruh claim is hereby **GRANTED** in favor of Defendants.

### X. Claims Under 42 U.S.C. §§ 1982 and 1983

Defendants assert that Plaintiffs have failed to produce evidence from which a jury could find that Defendants violated Plaintiff Cross's civil rights as guaranteed to her by 42 U.S.C. §§ 1982 and 1983. The Court will address each contention.

### A. Section 1982

■ Section 1982 of Title 42 (" § 1982") provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof, to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1982. In the present case, Defendants have attacked Plaintiffs' § 1982 claim on two apparently distinct grounds. First, Defendants contend that Plaintiff Cross has failed to produce evidence from which a jury could conclude that she satisfied the prima facie elements of unlawful discrimination under § 1982.[26] Second, Defendants argue that Cross was not denied any of the rights enumerated under § 1982.

■ With respect to Defendants' first contention, this Court has already concluded that the *McDonnell Douglas* burden-shifting analysis associated with demonstrating a prima facie case under a civil

---

**26.** In order to state a prima facie case for violation of § 1982, a plaintiff must allege and subsequently demonstrate that: (1) she is a member of a racial minority; (2) she applied for, and was qualified to rent or purchase, certain property or housing; (3) her applica-

tion was rejected; and (4) the housing or rental unit remained available after her denial. *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Phiffer v. Proud Parrot Motor Hotel,* 648 F.2d 548 (9th Cir.1980).

rights statute is inapplicable to this case. As with claims under the Fair Housing Act, direct evidence of discriminatory intent will obviate a plaintiff's need to show the prima facie elements of her cause of action under § 1982. *See Fair Housing Congress v. Weber,* 993 F.Supp. 1286 (C.D.Cal.1997). Here, Plaintiffs have provided direct evidence that Defendant Keagy bore a discriminatory attitude toward Plaintiff Cross, as well as African–Americans in general. Accordingly, as long as Cross can show that she suffered the loss or impairment of one of her guaranteed rights under § 1982, she need not demonstrate the elements required to state a prima facie case under the statute.

 Plaintiffs argue that Cross suffered impairment of her right to lease property when she became afraid to continue living in Pomona following Keagy's comments at the October 1st meeting. In response, Defendants assert that the distress suffered by Cross is a "far cry from the actual and intentional discrimination necessary to establish a violation under § 1982." Despite Defendants' suggestions, the Court finds that there was nothing unintentional about Keagy's discriminatory comments—unless Defendants are proposing that Keagy *accidentally* told a crowded room that he does not rent to African–Americans and that none of the other building owners in the K–KAPS district should do so either. However, because the Court concludes that the injury suffered by Cross does not fall within the ambit of protection under § 1982, the in-tentional nature of Keagy's discriminatory remarks is immaterial to the Court's conclusion on this issue.

 In reaching its decision on Plaintiffs' § 1982 claim, the Court is fully cognizant of the fact that a "narrow construction of the language of Section 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by Section 1 of the Civil Rights Act of 1866, from which Section 1982 was derived." *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 237, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). That § 1982 must be construed broadly, however, does not affect the rule that the "property rights protected under § 1982 are those included in the 'bundle of rights' for which an individual pays when he or she leases a piece of property." *Bradley v. Carydale Enterprises,* 730 F.Supp. 709, 717 (E.D.Va.1989) (citing to *Tillman v. Wheaton–Haven Recreation Assn.,* 410 U.S. 431, 437, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973)). *Bradley* does not, as Plaintiffs imply, stand for the proposition that hurt feelings and annoyance as a result of racial prejudice in the neighborhood are, by themselves, actionable under § 1982. Rather, the court in *Bradley* found that the plaintiff, in alleging that her landlord took inadequate measures to combat racially motivated harassment in the apartment building, stated a claim under § 1982 because the building owner failed to respect the covenant of quiet enjoyment, for which the tenant bargained when she entered her lease.[27] *Id.* For that reason, the

---

**27.** The Court does not imply that claims under § 1982 will only lie against landlords and building owners who have a direct legal relationship with the claimant. Such would be contrary to the Supreme Court's holding in *Sullivan:* "The right to 'lease' is protected by § 1982 *against the actions of third parties,* as well as against the actions of the immediate lessor." 396 U.S. at 237, 90 S.Ct. 400 (emphasis added). However, in cases such as

*Bradley,* where the particular "stick" in the "bundle" of property rights alleged to have been removed or injured is the right to quiet enjoyment of the property, a § 1982 claim may be asserted only against the landlord because the landlord is the only party legally obligated to effectuate the *covenant of quiet enjoyment of the premises.*

court concluded that the plaintiff's claim could be "classified as a claim for restricted use of property." *Id.*

In the present case, Keagy's discriminatory comments, while potentially unlawful under the regulatory scheme of the federal and state fair housing laws, did not rob Plaintiff Cross of one of the property rights for which she bargained when she entered into her lease agreement. Accordingly, summary adjudication in favor of Defendants on Plaintiffs' § 1982 claim is hereby **GRANTED.**

### B. Section 1983

In requesting summary adjudication of Plaintiff Cross's claim against Defendant Keagy under 42 U.S.C. § 1983 (" § 1983"), Defendants assert that Plaintiffs have provided no evidence from which a jury could conclude: (1) Keagy acted under color of law; and (2) Cross was denied equal protection under the law, as guaranteed to her by the Fourteenth Amendment. The Court does not agree.

Section 1983 provides, in relevant part:

Every person who, under color of [law] subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

■ Defendants contend that, as a matter of law, Keagy was never an agent of the City and that accordingly Plaintiffs must demonstrate that Keagy's actions were "fairly attributable" to the government. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). This Court has already concluded, however, that a genuine issue of fact exists as to whether Keagy was, in fact, acting as the City's agent when he spoke at the October 1st meeting. Even had it not, however, the Court could not find, as a matter of law, that the discriminatory statements and correspondence disseminated by K–KAPS and Keagy were not "fairly attributable" to the City.[28] Moreover, the Court agrees with Plaintiffs' proposition that there is no rigid formula for measuring state action for purposes of determining liability under § 1983. Rather, such determination must be made only after the "process of sifting facts and weighing circumstances" has run its course. *McDade v. West,* 223 F.3d 1135, 1139 (9th Cir.2000). In this case, Plaintiffs have produced sufficient evidence to allow a jury to conduct the sifting and weighing for themselves.

---

Additionally, the present case is clearly distinguishable from cases in which § 1982 claims were upheld against third parties because they directly and/or physically interfered with the plaintiffs' exercise of their property rights. *See e.g., Sullivan* (Black lessee stated § 1982 claim against private club that, on account of race, refused to approve lessee's assignment of membership privileges at club, even though the express terms of the lease stated that part of lessee's monthly rent went to membership dues); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse—Wisconsin, Inc.,* 991 F.2d 1249 (7th Cir.1993) (Native Americans who were entitled, by the terms of a federal treaty, to spear-fish on lake, stated a § 1982 claim against protesters who, on account of race, physically assaulted and violently threatened the Native Americans when they attempted to exercise their right to use the lake).

28. The Court catalogued the evidence relevant to this issue when it addressed Keagy's status as an agent of the City. Suffice it to say, for purposes of analyzing Plaintiff's § 1983 claim, Keagy was personally recruited by Paula Lantz, an official of the City, to assume the directorship of K–KAPS after Layton stepped down, and after the City had already taken steps establishing its interest in the development and activities of the association.

■ Additionally, the Court does not agree with Defendants' contention that even if Keagy acted under color of law, Plaintiffs have provided no evidence from which a jury could conclude that Cross was deprived of her Fourteenth Amendment right to equal protection under the law. Plaintiffs correctly note that neither a governmental entity nor an individual acting under color of law may authorize racial discrimination in the housing market. *Reitman v. Mulkey,* 387 U.S. 369, 381, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). If a jury were to find, as the Court has found that it could, that Keagy was acting as an agent of the City when he stood in front of the K–KAPS meeting and encouraged building owners not to rent to African–Americans, then the jury might also find that such encouragement constituted a violation of the Fourteenth Amendment. As was the case in *Reitman,* the Plaintiffs in this case have provided evidence tending to demonstrate that the close connection between the City and the K–KAPS organization was perceived as the imprimatur of the City of Pomona being stamped on the discriminatory actions of Keagy and the association.

In sum, the Court finds that Plaintiffs have raised a genuine issue of fact as to whether Keagy while acting under color of law deprived Cross of her constitutionally protected right to equal protection. Accordingly, Defendants' request for summary adjudication of Plaintiffs' § 1983 claim is **DENIED.**

## XI. Intentional Infliction of Emotional Distress[29]

Plaintiff Cross has also stated a claim against Defendant Keagy for intentional infliction of emotional distress. Keagy asserts that Plaintiffs have not provided any evidence from which a jury could reason-

ably find that each element of the cause of action was satisfied. Again, the Court disagrees.

■ Under California law, recovery under a theory of intentional infliction of emotional distress requires a showing of: (1) extreme and outrageous conduct by the defendant; (2) with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (3) which actually and proximately causes (4) the plaintiff's severe or extreme emotional distress. *See Christensen v. Superior Court,* 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991); *KOVR–TV, Inc., v. Superior Court,* 31 Cal.App.4th 1023, 1028, 37 Cal.Rptr.2d 431 (1995); *Sabow v. U.S.,* 93 F.3d 1445, 1454 (9th Cir.1996). In his moving papers, Keagy does not dispute that Plaintiff Cross has provided evidence from which a jury could find that she suffered severe emotional distress that was actually and proximately caused by what she heard at the October 1st meeting. Rather, Keagy's arguments are limited to the first two elements of the cause of action; he asserts that, as a matter of law, his comments did not constitute extreme and outrageous conduct, and that Plaintiff has provided no evidence in support of her allegation that Keagy acted with the intent to cause Plaintiff's severe emotional distress.

■ Defendant correctly states that conduct may only be considered "outrageous," with respect to claims for intentional infliction of emotional distress, if it is so extreme as to "exceed all bounds of that usually tolerated in a civilized community." *Nally v. Grace Community Church,* 47 Cal.3d 278, 300, 253 Cal.Rptr. 97, 763 P.2d 948 (1988); *see also Cervantez*

---

**29.** Both Defendant Keagy's Motion and Plaintiff Cross's Opposition to the Motion also discuss *negligent* infliction of emotional distress. However, because the negligence claim was previously dismissed with .prejudice, the Court will not address the issue here.

*v. J.C. Penney Co.*, 24 Cal.3d 579, 593, 156 Cal.Rptr. 198, 595 P.2d 975 (1979). However, where reasonable minds may differ, "it is for the jury ... to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d 493, 499, 86 Cal.Rptr. 88, 468 P.2d 216 (1970).

In the present case, the Court finds that reasonable minds may differ as to whether Keagy's discriminatory remarks transcended the bounds of behavior usually tolerated in a civilized society. Indeed, the facts as alleged and substantiated by Plaintiff are certainly such that, upon being informed of them, an average member of the community might exclaim, "Outrageous!" *See KOVR–TV*, 31 Cal. App.4th at 1028, 37 Cal.Rptr.2d 431; *Restatement (Second) of Torts* § 46 cmt. d. Moreover, the California Supreme Court has long recognized that a jury may consider a plaintiff's race in evaluating the plaintiff's susceptibility to emotional distress resulting from discriminatory conduct. *See Alcorn*, 2 Cal.3d at 498, 86 Cal.Rptr. 88, 468 P.2d 216. Accordingly, a jury in the present action would be permitted to consider that Keagy's discriminatory comments were directed against African–Americans; Plaintiff Cross is African–American, and there is evidence that Cross was the only African–American in the room at the October 1st meeting. Those facts alone could prove sufficient to allow a jury to conclude that Defendant Keagy knew or had reason to know that Cross would be especially susceptible to emotional distress as a result of discriminatory conduct at the K–KAPS meeting. *See Angie M. v. Superior Court*, 37 Cal.App.4th 1217, 1226, 44 Cal.Rptr.2d 197 (1995). While such knowledge of special susceptibility to emotional distress is not a required element of the tort, the jury is allowed to consider it in determining whether conduct is "outrageous." *Id.*

Defendant also argues, unconvincingly, that Plaintiffs have produced no evidence that Keagy by making discriminatory remarks at the October 1st meeting intended to injure Cross. First, Plaintiffs *have* produced evidence from which a jury could infer that Keagy spoke with at least a secondary intention of causing Cross emotional upset. Defendant cites Cross's deposition for the proposition that during the October 1st meeting, Keagy "did not so much as acknowledge the presence of Ms. Cross...." Cross's deposition, however, indicates only that Keagy did not speak Cross's name or make any physical gestures toward her during his speech. Indeed, Plaintiffs have presented evidence that Keagy was looking directly at Cross when he made his discriminatory comments—evidence that a jury could consider, in conjunction with the evidence that Cross was the only black woman in the room, in determining whether Keagy spoke with the intent of causing Cross severe emotional distress.

Second, in asserting that Plaintiffs must provide evidence from which a jury could conclude that Keagy actually intended to inflict emotional distress upon Cross, Defendants misstate the law. A plaintiff seeking to recover for intentional infliction of emotional distress may also demonstrate that the defendant acted with "reckless disregard of the probability of causing" severe emotional distress. *Christensen*, 54 Cal.3d at 903, 2 Cal. Rptr.2d 79, 820 P.2d 181; *see also Spackman v. Good*, 245 Cal.App.2d 518, 530, 54 Cal.Rptr. 78 (1966). Plaintiff need not, however, demonstrate that Keagy acted with a "malicious or evil purpose." *KOVR–TV*, 31 Cal.App.4th at 1031, 37 Cal. Rptr.2d 431. Rather, Plaintiff need only provide evidence from which a jury could conclude that Defendant "devoted little or no thought to the probable consequences

of his conduct." *Id.* (citing to *Miller v. National Broadcasting Co.*, 187 Cal. App.3d 1463, 1487, 232 Cal.Rptr. 668 (1986)) (quotations omitted). Again, the Court finds that a jury might conclude from the evidence demonstrating that Cross was the only African–American present, that Keagy at least acted recklessly with regard to the probability that his conduct would cause her severe emotional distress.

For the foregoing reasons, Defendant Keagy's request for summary adjudication of Plaintiff's intentional infliction of emotional distress claim is **DENIED.**[30]

## XII. Punitive Damages

▪ Defendant City correctly asserts that a municipality may not be subjected to an award for punitive damages. In *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 267, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), the United States Supreme Court held that a municipality was not liable for damages under § 1983. In reaching this conclusion, the Court noted the "general rule" that punitive damages are not allowed against a municipality unless such an award is expressly authorized by statute. *Id.* at 260–66, 101 S.Ct. 2748. The Court went on to note that Congress did not expressly authorize punitive damages against municipalities under § 1983. *Id.* at 265–66, 101 S.Ct. 2748.

▪ Congress has not authorized awards of punitive damages under the FHA. Plaintiffs argue that Congress has authorized punitive damages for FHA claims in general, and that Congress did not provide an exception for municipalities. *See* 42 U.S.C. § 3613(c). However, under *Fact Concerts*, Congress must expressly authorize awards · of punitive damages against municipalities. The FHA's general provision regarding the availability of punitive damages is simply not sufficient under *Fact Concerts*. *See Heritage Homes of Attleboro, Inc. v. Seekonk Water District*, 670 F.2d 1 (1st Cir.1982) (applying *Fact Concerts* and concluding that the FHA does not authorize awards of punitive damages against municipalities); *Hispanics United of DuPage County v. Village of Addison*, 958 F.Supp. 1320 (N.D.Ill.1997) (same).

Plaintiffs cite *United States v. City of Hayward*, 805 F.Supp. 810, 813 (N.D.Cal. 1992), *rev'd in part on other grounds*, 36 F.3d 832 (9th Cir.1994), *cert. denied*, 516 U.S. 813, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995), and contend that *Hayward* supports an award of punitive damages against municipalities because municipalities are liable for civil rights violations under the doctrine of respondeat superior. Nevertheless, this doctrine cannot operate to confer liability for punitive damages upon municipalities in light of *Fact Con-*

---

**30.** That Cross did not state a claim for intentional infliction of emotional distress against the City does not negate the Court's prior finding that a jury might conclude that Keagy was speaking in his capacity as the City's agent at the October 1st meeting. If the jury were to make such a finding, then the above analysis of Defendants' First Amendment defense would apply to the intentional infliction of emotional distress claim as well.

The holdings cited by Defendant are inapposite to the present case; they concern either defamation suits or emotional distress claims brought against corporate entities by public figures. · The instant case is not about defamation nor is Cross a public figure. As the Court has found no authority suggesting that the reasoning of *Hustler v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (satirical magazine ad portraying well-known political commentator in obscene situation is protected against intentional infliction of emotional distress claim by First Amendment), should be applied to an emotional distress suit brought by a private citizen against a municipal agent, Defendant Keagy's First Amendment defense must fail.

*certs.* A municipality can act only through its employees, and to permit awards of punitive damages against municipalities through the doctrine of respondeat superior would effectively vitiate the holding of *Fact Concerts.*

Plaintiffs also cite *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), for the proposition that, absent clear direction to the contrary by Congress, federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute. However, *Franklin* cannot fairly be read to limit the holding of *Fact Concerts; Franklin* does not discuss *Fact Concerts,* punitive damages, or municipalities.

■ Plaintiffs also argue that awards of punitive damages against municipalities are appropriate under FEHA. Generally, under California law, public entities are not liable for punitive damages. *See* Cal. Gov't Code § 818. The California Supreme Court has interpreted § 818 to prohibit awards of punitive damages against municipalities in cases involving FEHA claims. *State Personnel Board v. Fair Employment and Housing Comm'n,* 39 Cal.3d 422, 217 Cal.Rptr. 16, 703 P.2d 354 (1985). Plaintiffs argue that § 818 does not apply to fair housing claims brought under FEHA in light of Cal. Gov't Code § 12955.6, which states that "[n]othing in this part shall be construed to afford the classes protected under this part, fewer rights or remedies than the federal Fair Housing Amendments of 1988." Plaintiffs argue that FEHA authorizes punitive damages against municipalities because to conclude otherwise would have the effect of conferring fewer rights or remedies under FEHA than are available under the FHA.

This argument fails for two reasons. First, the Court has already concluded that the FHA does not authorize awards of punitive damages against municipalities. Second, § 12955.6 states that "nothing in this ***part***" should be construed to confer fewer rights or remedies than the FHA. "This part" refers to California Government Code, Title 2, Division 3, Part 2.8 Department of Fair Employment and Housing. Conversely, § 818 appears in California Government Code, Title 1, Division 3.6, Part 2 Liability of Public Entities and Public Employees. Therefore, § 818 could be interpreted to afford a FEHA plaintiff with fewer rights and remedies than an FHA plaintiff, without running afoul of § 12955.6's prohibition.

Therefore, the Court concludes that an award of punitive damages against the City of Pomona is not authorized by § 1983, the FHA, or FEHA. Accordingly, summary adjudication in favor of Defendant City on Plaintiff's punitive damages claim is hereby **GRANTED.**

■ Defendant Keagy, however, has also asked the Court to render summary adjudication of Plaintiffs' punitive damages claim in his favor. This request is denied. It is true that if a jury were to find that Keagy was acting as an agent of the City when he spoke at the October 1st meeting, Keagy would also be immune from liability for punitive damages. If, however, a jury were to conclude that Keagy was not acting in his capacity as an agent of the City, Keagy would then be subject to an award of punitive damages.

In his Motion, Keagy apparently neglected to address the possibility of punitive damages on Plaintiff's federal claims, focusing only on the punitive damage requirements under California law. Under either federal or state law, however, the Court concludes that Plaintiff has provided sufficient evidence to allow a jury to render an award of punitive damages.

■ Interpreting *Kolstad v. American Dental Assn.*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), in which the Supreme Court held that an actor may be liable for punitive damages in any case where he discriminates in the face of a "perceived risk that [his] actions will violate federal law," the Ninth Circuit has stated that, "in general, intentional discrimination is enough to establish punitive damages liability." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir.2000). There are, however, three situations in which an actor may not be held liable for punitive damages despite a finding of intentional discrimination: (1) if the plaintiff's theory is so novel that the actor could have reasonably believed his action was legal although discriminatory; (2) if the actor, often an employer, reasonably believed he had a valid bona fide occupational qualification defense to his conduct; and (3) if the actor is actually unaware of the federal law against discrimination under which the suit is asserted against him. *Id.* "Common to all these situations," the Ninth Circuit noted, "is that they occur when the [actor] is aware of the specific discriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful." *Id.*

In the present case, as in *Passantino*, application of *Kolstad*'s intentional discrimination requirement to the evidence provided by Plaintiff leaves no doubt that punitive damages are available, should a jury choose to award them. Indeed, the evidence strongly supports the contention that Defendant Keagy acted with reckless indifference to Plaintiff Cross's federally protected rights under the Fair Housing Act and 42 U.S.C. § 1983. After all, Keagy testified at his deposition that he had been aware for almost twenty years that federal law prohibited discrimination in the rental of housing. Moreover, Keagy communicated his knowledge of the fair housing laws to members of K–KAPS when he encouraged fellow building owners to not let "government regulations ... intimidate you to rent to someone you don't want to rent to." Additionally, the present case is not akin to any of the three situations in which punitive damages would not be available for the simple reason that Keagy was *at least* recklessly indifferent to whether his conduct was prohibited under federal law.

Under California law, punitive damages are available only upon a showing that the defendant acted with "oppression, fraud, or malice." Cal.Civ.Code § 3294; *Commodore Home Systems, Inc., v. Superior Court*, 32 Cal.3d 211, 185 Cal.Rptr. 270, 649 P.2d 912 (1982). "Malice," for purposes of determining the availability of punitive damages, is further defined as including "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights ... of others." Cal.Civ.Code § 3294(c)(1). Defendant Keagy asserts that it would be "incongruous" for the Court to find: (a) that his conduct at the October 1st meeting was not so "outrageous" as to justify liability for intentional infliction of emotional distress; and also (b) that such conduct might have been "despicable," within the meaning of § 3294(c)(1). The Court, however, has already concluded that reasonable minds might differ as to whether Keagy's conduct was, in fact, sufficiently outrageous to justify a finding of liability on Plaintiff Cross's tort claim. Therefore, Defendant's concerns are unfounded. Moreover, the Court agrees with Plaintiff that the same facts that could support a finding that Keagy acted with reckless disregard for Plaintiff's protected rights under federal law could also support a finding that Keagy's conduct was sufficiently despicable to support a punitive damages award on Plaintiff's intentional infliction of emotional distress claim.

As Plaintiffs have produced evidence from which a jury could find that the required elements of a punitive damages award are satisfied, Defendant Keagy's request for summary adjudication of Plaintiffs' claim for punitive damages is **DENIED.**

### XIII. Availability of Equitable Relief

Finally, Defendants assert that Plaintiffs' prayer for injunctive relief should be summarily adjudicated in favor of Defendants.

■ Defendants rely on *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), in support of the proposition that the Plaintiffs in the case at bar would not be entitled to injunctive relief even if they secured a favorable finding as to liability. In *Lyons,* a plaintiff who had been roughed up by the police sought an injunction prohibiting the use of choke-holds by police officers. *Id.* at 111, 103 S.Ct. 1660. Holding that the plaintiff had failed to demonstrate a "sufficient likelihood that he will again be wronged in a similar way," the Supreme Court concluded that the plaintiff was not entitled to injunctive relief. *Id.* In the present case, Defendants argue that because K–KAPS no longer exists and because Keagy resigned from his position as director of K–KAPS, Plaintiffs cannot demonstrate a likelihood that they will again be injured in a similar manner.

The Court agrees that Plaintiff Cross, who vacated her apartment in Pomona following the K–KAPS meeting in October of 1998, cannot demonstrate a sufficient likelihood that she will again be harmed by these defendants if she is not granted some form of injunctive relief. *See Harris v. Itzhaki,* 183 F.3d at 1050 (plaintiff's request for declaratory and injunctive relief against building owner were rendered moot by her departure from the apartment). Accordingly, summary adjudication of any claim for injunctive relief asserted by Plaintiff Cross is hereby **GRANTED** in favor of Defendants. With respect to Plaintiff IMB, however, Defendants' analysis is too narrow.

K–KAPS is only one of the three defendants named in this action. That K–KAPS no longer exists has no bearing on the claims for relief pending against Mr. Keagy and the City of Pomona. Moreover, while this Court has concluded that a jury might reasonably find that Keagy was acting as an agent of the City when he spoke at the October 1st meeting, a jury might also conclude that Keagy was acting only in his individual capacity or only as the director of the K–KAPS association. Therefore, injunctive relief might well remain available against both Keagy and the City, despite the fact that K–KAPS no longer exists.

Citing *Williamsburg Fair Housing Committee v. N.Y.C. Housing Authority,* 493 F.Supp. 1225 (S.D.N.Y.1980), *aff'd without opinion,* 647 F.2d 163 (2d Cir. 1981), Plaintiffs persuasively contend that if a jury were to find that Defendants did, in fact, conduct discriminatory housing practices in violation of federal and state law, Defendants' failure to appreciate the wrongfulness of their conduct might support a grant of permanent injunctive relief. In *Williamsburg,* which dealt with a challenge to a building owner's use of racial quotas in renting apartment units, the District Court wrote,

> The Court has additional reasons to fear that, absent such an injunction, violations [of the Fair Housing Act] will recur. The ... defendants indicate an apparent lack of understanding of the wrongfulness of using the quota. In fact, they continue to deny that they used a quota at Bedford Gardens [despite a finding that they did]. The Court also notes that the ... defendants made broad statements about communi-

ty support and encouragement for the quota. . . . *Id.* at 1250. In the present case, as in *Williamsburg,* the uncontroverted facts demonstrate that Defendants have a similar lack of understanding of the potential wrongfulness of their conduct. Indeed, Plaintiffs have provided evidence that Defendant Keagy personally believes, and has attempted to convince others, that federal fair housing statutes are not enforceable, and that the government cannot in any way influence a building owner's decision regarding the acceptance of tenants. Similarly, as in *Williamsburg,* the evidence establishes that Defendant Keagy made broad statements, both spoken and written, encouraging building owners in the K–KAPS district to ignore the mandates of the Fair Housing Act when selecting their tenants. Therefore, Plaintiffs have raised a triable issue of fact as to whether Defendants might engage in discriminatory housing practices in the future.[31]

Finally, the Fair Housing Act expressly provides that if a court finds that housing discrimination has already occurred, the court "may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)." 42 U.S.C. § 3613(c)(1). Where injunctive relief is expressly authorized by statute, proof that the defendant violated such statute is "sufficient to support an injunction remedying those violations." *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th

Cir.1984) (addressing plaintiff's request for *preliminary* injunctive relief, and therefore requiring only a *substantial likelihood* that defendant violated fair housing statute); *see also Topic v. Circle Realty,* 377 F.Supp. 111, 114 (C.D.Cal.1974), *rev'd on other grounds,* 532 F.2d 1273 (9th Cir. 1976).

In sum, the Court finds that were Defendants to be adjudged guilty of fair housing and anti-discrimination violations, Plaintiffs have provided evidence sufficient to support a grant of injunctive relief. The Court need not, however, decide either the nature of the injunction or whether the Court would, in fact, exercise its discretion to grant injunctive relief. It is enough, for purposes of these Motions, that injunctive relief remains a viable option. Defendants' requests for summary adjudication of Plaintiff IMB's prayer for equitable relief are therefore **DENIED.**

### XIV. Conclusion

The Court **hereby grants in part and denies in part** Defendants' Motions for Summary Judgment. With respect to the threshold issue of standing, both plaintiffs have adequately substantiated their allegations that they have suffered the requisite injury to achieve standing under federal and state fair housing laws. Similarly, Plaintiffs have raised triable issues of fact as to whether Defendant Keagy was an agent of the City of Pomona when he spoke at the October 1st meeting and therefore, whether Keagy's speech is entitled to protection under the First Amendment. Defendants' requests for summary

---

**31.** It must also be remembered that one of the primary reasons Plaintiff IMB has standing to join as a plaintiff in this action is that it expended significant resources coordinating, executing, and subsequently reviewing, the fair-housing testing at Keagy's property. Therefore, in light of Keagy's public announcement of his express policy of not rent-

ing to African–Americans, as well as his encouragement of other building owners to adopt similar discriminatory policies, injunctive relief may be appropriate. Absent such relief, nothing would stop these parties from potentially being back before this Court, or any other District Court, two or three years from now.

adjudication of these threshold issues are therefore **DENIED.**

With respect to Defendants' substantive arguments, the Court finds that Plaintiffs have raised triable issues of fact as to their claims under 42 U.S.C. §§ 3604(a) and (c), as well as § 3617. Accordingly, Defendants' requests for summary adjudication of these claims are **DENIED.** However, for the reasons stated above, Defendants' requests for summary adjudication of Plaintiffs' claims under 42 U.S.C. §§ 3604(b) and (d), as well as § 3608, are **GRANTED.** In addition, both defendants' requests for summary adjudication of Plaintiffs' claims under Cal.Govt.Code §§ 12955(c), (g), and (k) are **DENIED.** However, while Defendant Keagy's requests for summary adjudication of Plaintiffs' claims under Cal.Govt.Code §§ 12955(a) and (d) are also **DENIED,** Defendant City's requests under those sections are hereby **GRANTED.**

The Court also **grants in part and denies in part** Defendants' requests for summary adjudication of Plaintiffs' other civil rights claims. With respect to Plaintiffs' claim under California's Unruh Civil Rights Act (Cal.Civ.Code § 51), summary adjudication is hereby **GRANTED** in favor of Defendants. Moreover, Defendants' request for summary adjudication of Plaintiffs' claim under 42 U.S.C. § 1982 is also **GRANTED.** However, for the reasons set forth above, summary adjudication of Plaintiff Cross's claim under 42 U.S.C. § 1983 is hereby **DENIED.**

In addition, Defendant Keagy's request for summary adjudication of Plaintiff Cross's claim for intentional infliction of emotional distress is **DENIED.** Moreover, although summary adjudication of Plaintiffs' request for punitive damages is hereby **GRANTED** in favor of Defendant City, Plaintiffs have provided evidence from which a jury could find that Defendant Keagy's conduct warrants an award of punitive damages. Accordingly, Keagy's request for adjudication of Plaintiffs' prayer for punitive damages is **DENIED.** Finally, as Plaintiff Cross has vacated her apartment in the City of Pomona and is not likely to again be injured by these Defendants, summary adjudication of any claim for injunctive relief asserted by Cross is hereby **GRANTED** in favor of Defendants. However, for the reasons set forth above, Defendants' request for summary adjudication of Plaintiff IMB's claim for injunctive relief is **DENIED.**

**IT IS SO ORDERED.**